*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TESORO ALASKA COMPANY, | ) | |
| | ) | Supreme Court Nos. S-14122/14132 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3AN-08-05877 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| UNION OIL COMPANY OF | ) | No. 6802 – July 26, 2013 |
| CALIFORNIA, UNOCAL PIPELINE | ) | |
| COMPANY, and UNOCAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Appellees and | ) | |
| Cross-Appellants. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter A. Michalski, Judge.

Appearances: Robin O. Brena and Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Appellant/Cross-Appellee. Stephen M. Ellis, Delaney Wiles, Inc., Anchorage, for Appellees/Cross-Appellants.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

CARPENETI, Chief Justice.

I.      INTRODUCTION

In 2001 an oil producer on the Alaska North Slope entered into a contract to sell its oil to another oil company. Under the contract the buyer took title at the North

Slope, but agreed to use a pipeline company associated with the supplier to transport the oil through the Trans-Alaska Pipeline. The price per barrel was calculated as the West Coast market price less marine transport and pipeline tariff. The contract made no mention of whether the pipeline tariff was tied to the ultimate destination of the oil. At the time, the interstate and intrastate pipeline tariffs were the same. The buyer shipped the oil to an in-state refinery and paid the tariff to the pipeline company. The supplier duly subtracted the tariff amount from the market price of the oil less marine transport and sent invoices to the buyer. Meanwhile, the buyer successfully challenged the intrastate tariff as unjust and unreasonable and the pipeline company issued a refund, including 10.5% interest. Then, the supplier claimed that it was entitled to the tariff refund under the contract. The superior court, on motions for summary judgment, awarded the principal amount of the refund to the supplier and the interest to the buyer.

Both parties appeal. The buyer claims that the reference to tariffs in the contract related to interstate tariffs because the price of the oil was a netback price to the Los Angeles market. The supplier asserts that the contractual reference to tariffs meant the actual tariff amount paid. In its cross-appeal, the supplier asserts that because it was awarded the principal amount, it should have received the statutory interest as well. We hold that the pricing term was a netback price to the Los Angeles market referencing the interstate tariff. Accordingly, we reverse the superior court's grant of summary judgment to the supplier and remand for entry of judgment in favor of the buyer. In light of our conclusion, we do not reach the issues raised in the cross-appeal.

## II.    FACTS AND PROCEEDINGS
### A.    Facts
#### 1.    Background and Regulatory Commission of Alaska proceedings

This appeal concerns two crude oil purchase contracts between Tesoro Alaska Company (Tesoro) and Union Oil Company of California (Union Oil). Under

the contracts Tesoro agreed to purchase all of Union Oil's Alaska North Slope (ANS) crude oil production in 2000, 2001, and 2002. The first contract was executed in November 1999, covering January 1, 2000 through December 31, 2000. The second contract was executed in November 2000; it covered January 1, 2001 through December 31, 2002. Under the contracts, title and risk of loss transferred to Tesoro at the outlet flange of Pump Station No. 1[1] of the Trans-Alaska Pipeline System (TAPS). The price was set as follows:

> The price . . . shall be the average ANS [crude oil] closing price as quoted by Reuters and Telerate for each trading day of the month prior to the delivery . . . less $1.35 per barrel for marine transportation less one of the following:
>
> a.) Tesoro will, at Unocal's direction, nominate and ship the Quantity of [crude oil] onto Unocal Pipeline space on TAPS and the Unocal [Pipeline] TAPS tariff shall apply to all [Union Oil] Crude shipped on Unocal [Pipeline] space. Tesoro agrees to pursue any such nomination diligently and absolutely until or unless prorated out of Unocal Pipeline space.
>
> b.) If not directed by Unocal, Tesoro shall use its best efforts to nominate and ship the Quantity of [crude oil] on the TAPS so as to minimize, to the extent practical, pipeline transportation costs. The weighted average tariff rates paid by Tesoro shall then apply.

TAPS carries oil from the Alaska North Slope to Valdez. The owners of the pipeline are allocated space and share costs according to the portion of the pipeline owned. Some pipeline owners are affiliated with oil producers. Here, Unocal Pipeline

---

[1]	Pump Station No. 1 is the beginning of the Trans-Alaska Pipeline. The Center for Land Use Interpretation, *The Trans-Alaska Pipeline*, LAY OF THE LAND NEWSLETTER (Spring 2009), http://www.clui.org/newsletter/spring-2009/trans-alaska-pipeline.

was owned by the same parent company as Union Oil, Unocal Corporation. Pipeline owners are considered common carriers. Subject to regulatory oversight, each pipeline owner determines a tariff for oil shipped through its space. The pipeline tariffs are subject to different regulation depending upon whether the oil is ultimately shipped interstate or intrastate. The Federal Energy Regulatory Commission regulates interstate tariffs, while the Regulatory Commission of Alaska (RCA) regulates intrastate tariffs and is tasked with setting "just and reasonable rates." Throughout the duration of these contracts the intrastate and interstate tariffs were the same.

Tesoro challenged the TAPS intrastate tariffs, including that of Unocal Pipeline, in two RCA proceedings, one covering tariffs from 1997 to 2000 and another covering tariffs from 2001 to 2003. In December 1997, Unocal Corporation's counsel placed himself on the distribution list for matters concerning the tariff rate proceedings and received RCA orders. After Tesoro's challenge was initiated the RCA issued orders accepting the filed tariff rates as "temporary" and collectable but "subject to refund."

In the meantime, Union Oil delivered the oil and Union Oil's affiliated pipeline company, Unocal Pipeline Company, shipped it. Unocal Pipeline Company invoiced Tesoro using the published pipeline tariff rates for the duration of the contract. Tesoro paid all invoices. Ultimately, the RCA found that the intrastate tariffs were unjust and unreasonable.[2] In 2008, as a result of Tesoro's rate protest, Unocal Pipeline was required to issue a refund to Tesoro of over $24 million in principal and interest.

---

[2] The pipeline companies appealed one of the orders, which was affirmed by this court in *Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska*, 176 P.3d 667, 669 (Alaska 2008). The pipeline companies declined to appeal the other order. In 2008 the pipeline companies issued appropriate refunds.

## 2.    The first contract

Union Oil contracted with ARCO for the sale of Union Oil's ANS crude for 1998 and 1999. Under the contract ARCO was required to ship the oil on Unocal Pipeline space "so that [Unocal Pipeline] would be assured of at least some revenues to offset its ongoing TAPS expenses." The pricing mechanism on the ARCO contract was based on a West Coast delivery point. Therefore, although ARCO was required to take title and risk of loss at Pump Station No. 1 and ship on Unocal Pipeline space, according to Unocal, ARCO could deduct "the theoretical transportation cost of moving the ANS crude to Valdez" and the marine transport cost from Valdez to Los Angeles.

As the ARCO contract neared expiration Tesoro began negotiations with Union Oil. The contract between Union Oil and Tesoro was essentially the same contract that Union Oil had previously negotiated with ARCO. Point of sale was on the North Slope and title and risk of loss passed at Pump Station No. 1. Tesoro agreed to ship on Unocal Pipeline space if space was available and the tariff would be deducted from the price charged. The contract contained no mechanism for retroactive pricing adjustments and no definitions section. However, there was a reservation for retroactive adjustment of taxes.

When the contract circulated within Union Oil and was passed to Tesoro, there was no indication that either party discussed the meaning of the "Unocal [Pipeline] TAPS Tariff" term. Internal Union Oil emails do not indicate that Union Oil reserved the right to seek a refund; they also do not clarify whether the pricing mechanism was tied to the interstate tariff. The emails give an overview of the pricing mechanism and key contract terms, such as maintaining sale at Pump Station No. 1 and shipping on Unocal Pipeline space, and note the then-current interstate (and intrastate) tariff. A post-contract Unocal email refers to "netback" pricing stating, "[h]ere are the pipeline netback numbers you requested," and requests verification of the tariff amounts.

Union Oil claims that it understood the pricing mechanism as a "penny for penny pass-through payment," where Union Oil would reimburse Tesoro for the actual transportation costs; Tesoro claims that the pricing mechanism was a netback price[3] tied to the West Coast market, simply a convenient way to price crude oil purchased in an untraded market that was not tied to the actual transportation costs. A November 3, 1999 Union Oil email noting the successfully-negotiated deal with Tesoro refers to "our netback North Slope price."

Union Oil admits that it did not expressly state its intention that the price would reflect actual costs, but claims that it understood that Tesoro would be able to deduct no "more than the actual TAPS transportation cost it incurred." A Union Oil employee also admitted that "Tesoro . . . would be allowed to deduct the theoretical transportation cost of moving ANS crude to Valdez, irrespective of the actual destination for the oil. The TAPS tariffs were selected as that was deemed to be the TAPS transportation cost that Tesoro would actually incur."

Tesoro's oil industry expert reviewed the contract and found that it contained a standard netback pricing mechanism. He testified that "[c]onsistent with industry practice, the [Union Oil] and Tesoro contracts agree to deduct the 'theoretical transportation costs,' " subtracting the interstate tariff rate regardless of where the oil shipped. The netback formula accounts for the fact that the seller did not bear the cost of shipping the oil to market; under the scheme the seller gets the net amount it would have gotten if it had shipped the oil to market and sold it there.

---

[3]    An expert for Tesoro testified that netback pricing is used in places like Alaska's North Slope where there is no widely-traded market for oil. It is a " 'theoretical' or surrogate price at Pump Station [No.] 1 net backed from a widely-traded market. A netback is the assumed final destination price less the assumed delivery charges to this hypothetical destination (*e.g.*, the Los Angeles basin)."

Union Oil submitted invoices using the base rate of the West Coast price and subtracting the marine transport and the weighted average TAPS rate (that is, the tariff). Tesoro paid the tariff to Unocal Pipeline or to other pipeline owners if shipped by another carrier. Neither party disputes that the invoices were paid as billed.

### 3. The second contract: 2001-2002

In 2000, the second contract was negotiated for 2001-2002. During negotiations, an internal Union Oil email provided an outline of the contract stating "Tesoro will ship on Unocal [Pipeline]'s space . . . ([Union Oil] will reimburse Tesoro for pipeline tariff)." No mention of a reimbursement plan was made to Tesoro. There was no reservation for possible tariff refunds. In the end, the second contract was the same as the first except for a change in the date. As with the 2000 contract Union Oil invoiced Tesoro and the invoices were paid.

### B. Proceedings

After Union Oil formally requested the RCA-ordered refunds, Tesoro filed a declaratory action to establish its rights. Union Oil counterclaimed, seeking the funds under the contracts.[4] Both parties filed cross-motions for summary judgment. The superior court granted summary judgment for Union Oil "as to refunds for tariffs paid on barrels of oil shipped intrastate." RCA-ordered tariff refunds have both a principal and a 10.5% interest rate component. The superior court awarded Union Oil the principal amount plus prejudgment interest based on a breach of contract theory but found that Union Oil was not entitled to the 10.5% statutory interest. Tesoro appealed, arguing that the contract's pricing mechanism was a netback price tied to interstate

---

[4] As noted above, there are two contracts at issue in this appeal. Because the relevant provisions are identical in the two contracts, this opinion occasionally refers to "the contract."

tariffs. Union Oil cross-appealed the superior court's conclusion that it was due only contract-based prejudgment interest rather than the 10.5% RCA-ordered interest.

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo."[5] All reasonable inferences are drawn in favor of the nonmoving party.[6] Summary judgment will be entered "if there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law."[7] "The moving party has the initial burden of offering admissible evidence showing both the absence of any genuine dispute of fact and the legal right to a judgment."[8] Once that burden is satisfied, the non-moving party, to avoid summary judgment, must produce "admissible evidence reasonably tending to dispute or contradict the movant's evidence."[9] The non-moving party may not, however, "rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue of material fact."[10] "To create a genuine issue of material fact there must be more than a scintilla of contrary evidence."[11]

---

[5] *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010) (citing *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004)).

[6] *Id.* (citing *Moore v. Allstate Ins. Co.*, 995 P.2d 231, 233 (Alaska 2000)).

[7] *Id.*

[8] *Cikan v. ARCO Alaska, Inc.*, 125 P.3d 335, 339 (Alaska 2005).

[9] *Philbin v. Matanuska-Susitna Borough*, 991 P.2d 1263, 1265-66 (Alaska 1999) (citing *Jennings v. State*, 566 P.2d 1304, 1309 (Alaska 1977)).

[10] *Cikan*, 125 P.3d at 339.

[11] *Id.* (quoting *Martech Constr. Co. v. Ogden Envtl. Servs., Inc.*, 852 P.2d 1146, 1149 n.7 (Alaska 1993)).

## IV. DISCUSSION

### A. It Was Error To Grant Summary Judgment To Union Oil.

The main issue in this case is which party is entitled to the RCA refunds. The key to this issue is the meaning of "Unocal [Pipeline] TAPS tariff" in the contract's pricing mechanism. Tesoro asserts that the contract used a netback pricing mechanism subtracting the filed interstate tariff (and marine transportation costs) reflecting the West Coast crude oil market price, fixed at delivery. In short, it is a theoretical market price not tied to any actual tariff paid on a particular barrel of oil. Union Oil asserts that the term was defined by reference to the particular tariff applicable to a given barrel of oil, and that therefore any refund from TAPS would flow back to Union Oil. The superior court found that the contract was "ambiguous as to price" and ultimately agreed with Union Oil's interpretation.

When resolving disputes concerning the meaning of an agreement, we "begin[] by viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms, in order to determine if those terms are ambiguous — that is, if they are reasonably subject to differing interpretation[s]."[12] Where an ambiguity exists, we resolve the ambiguity by determining "the reasonable expectations of the [contracting] parties" in light of the "language of any disputed provisions, other provisions, relevant extrinsic evidence, and case law interpreting similar provisions."[13]

---

[12] *Hartley v. Hartley*, 205 P.3d 342, 347 (Alaska 2009) (quoting *Zito v. Zito*, 969 P.2d 1144, 1147 n.4 (Alaska 1998)) (internal quotation marks omitted); *Rockstad v. Erikson*, 113 P.3d 1215, 1222 (Alaska 2005).

[13] *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993) (internal citations omitted); *see Monzingo v. Alaska Air Grp., Inc.*, 112 P.3d 655, 660 (Alaska 2005) ("Courts look to the language of the contract as a whole, the objects sought to be accomplished by the contract, the circumstances surrounding its adoption, and case law (continued...)

We look first to the language of the contract itself. Tesoro argues that the language is a standard netback pricing[14] formula. Union Oil claims that while the pricing mechanism set out a pricing formula it did not fix the actual price. Neither interpretation is required by the contract language, and the contract does not illuminate the meaning of the term as there is no definition section or any direction for managing possible retroactive adjustments.

Other provisions in the contract are likewise inconclusive because, although they explicitly address retroactive adjustments, they do not resolve the issue before us. For example, one such provision in the contracts allows Union Oil to retroactively collect taxes. Tesoro argues that the existence of other provisions providing for retroactive adjustments proves that Union Oil did not intend to include the ability to retroactively adjust price under the maxim "*expressio unius est exclusio alterius*."[15] We are not convinced that these other provisions are helpful in this case. First, the maxim, while it may be used in contract interpretation, is not applicable here.[16] It applies when "parties

---

[13] (...continued)
interpreting its provisions to ascertain the reasonable expectations of the parties." (citing *Craig Taylor Equip. Co. v. Pettibone Corp.*, 659 P.2d 594, 597 (Alaska 1983))).

[14] As noted above, a netback formula deducts from the assumed final destination price the assumed delivery charges to this hypothetical destination. *See supra* note 3. Here, the assumed final destination price was the monthly average of prices reported by Reuters and Telerate. The assumed delivery charges were comprised of a preset marine transportation charge ($1.35/barrel) and the applicable pipeline tariff.

[15] *Expressio unius est exclusio alterius* instructs that when parties list specific items any item not so listed is excluded. *See Vanvelzor v. Vanvelzor*, 219 P.3d 184, 188 (Alaska 2009) (citing *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 218-19 (Alaska 2005)).

[16] *See, e.g.*, *Bentley Mall Assocs. v. ADC Distrib. Corp.*, Mem. Op. & J.
(continued...)

list specific items in a document, [and instructs that] any item not so listed is typically thought to be excluded."[17] Second, although the existence of the provisions suggests that Union Oil could make retroactive contract adjustments, the omission of such a provision expressly related to tariffs does no more than show that Union Oil did not foresee a need for retroactive adjustment of tariffs. It does not resolve the underlying question, that is, "what does the term 'Unocal [Pipeline] TAPS tariff' mean in this contract?" Accordingly, we do not give much weight to the fact that the parties included other retroactive pricing adjustments.

The circumstances surrounding the adoption of the contract also are not useful in interpreting the term. Neither party paid much attention to the pricing mechanism; each simply adopted the pricing mechanisms in the original ARCO contract with an adjustment for marine transport cost. Further, internal emails from Union Oil suggest that netback pricing was contemplated, but they do not clarify whether the tariff deduction was tied to the ultimate destination of the oil. One email that announced the successful contract negotiations described the final "netback North Slope price" Union Oil could expect under the new contract. However, the email is silent on the issue of whether the tariff refers to interstate or intrastate tariffs. There simply is little indication that the parties considered a retroactive adjustment in the tariffs, either intrastate or interstate, at the time the contract was signed.

The objective of the contract, however, supports Tesoro's position. Union Oil argues that the contract's objective was to shift the cost of the tariff to it. Tesoro responds that the pricing term did not shift the cost of transportation, but rather sought

---

[16]     (...continued)
No. 865, 1997 WL 33812770, at *1 (Alaska, Oct. 15, 1997).

[17]     *Id.*

to provide a netback price so Tesoro was paying a West Coast market price for the oil. The superior court found that the contract "neutralize[d] the tariff cost [so that] Tesoro . . . was not actually affected by the unjust intrastate tariffs." It further found that because the contract was negotiated when the interstate and intrastate tariffs were identical, there was no need for the parties to differentiate between the two in the contract.

The contract's objective was to set a price for the oil that reflected the price that could be obtained in a widely-traded market. Union Oil's insistence that its affiliate pipeline be used to transport the oil does not change the fundamental goal of the contract's pricing term: setting a price for the oil. While Union Oil is correct that the contract shifts the cost of the tariff to it, that fact does not mean the contract was designed to insulate Tesoro from the tariffs. The parties were engaged in the buying and selling of oil. The focus of the contract and therefore its objective was necessarily the pricing of the oil. If the parties had intended the pricing scheme to provide reimbursement for the actual costs incurred by Unocal, the contract would have contemplated other actual costs associated with the transportation of oil. This would include the actual marine transportation costs (instead of setting a standard rate of $1.35/barrel throughout the life of the contract) and interstate tariffs that depend on the final destination of the oil.

Trade usage is extremely important in interpreting the pricing term. Tesoro presented an oil industry expert who stated that the contract pricing term was a netback designed to create a price for oil equivalent to that found in the West Coast market. The expert stated that at the time the contracts were signed the "[standard] industry practice for a net back price would [be] the FERC interstate tariff plus the marine transportation price . . . subtracted from the prior month's average Los Angeles basin posted prices to determine the contract price or net back to Pump Station #1." Union Oil did not present

evidence to rebut this expert, although it argues that trade usage is not relevant because the contracts are "relatively unique."

We look to the "general and accepted usage of the trade or business involved" when interpreting contracts.[18] Trade usage and case law can be relevant in interpreting a contract because "[a] person entering into a contract in the ordinary course of business is presumed to have done so in reference to any existing general usage or custom relating to such business."[19] Trade usage is helpful because it "often establishes a special and unusual meaning definitely in conflict with the more common and ordinary usages."[20]

In this case, trade usage is persuasive and, importantly, is not disputed. Standard pricing for Alaskan oil, whether title is transferred at Pump Station No. 1 or Valdez, is a netback to another market because there is no widely-traded market in Alaska. Tesoro's oil expert's determination that the contract provided a netback pricing scheme is instructive because the parties are sophisticated players in the oil industry, and they are presumed to have entered into the contract with knowledge of established practices. Here, each is presumed to know that the standard method for pricing Alaskan oil is a netback pricing formula referencing the interstate tariffs. Further, the lack of attention paid to the pricing mechanism suggests that the parties shared a common understanding of the term that was based on this industry practice.

---

[18] *Chambers v. Scofield*, 247 P.3d 982, 987 (Alaska 2011) (quoting *Dominic Wenzell, D.M.D. P.C. v. Ingrim, D.M.D.*, 228 P.3d 103, 108 (Alaska 2010) (internal quotation marks omitted)).

[19] *Graham v. Rockman*, 504 P.2d 1351, 1356 (Alaska 1972).

[20] *Jowett, Inc. v. United States*, 234 F.3d 1365, 1369 (Fed. Cir. 2000) (quoting 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 555, at 233-34 (1960)).

As noted above, the key to resolving contractual ambiguities is the parties' reasonable expectations.[21] At the time of contract formation, the two tariffs — interstate and intrastate — were the same, so neither party had a reason to indicate the destination of the oil for the purposes of calculating the deduction, and Union Oil sought to encourage shipping on its affiliated pipeline company to provide a revenue stream for the affiliate. However, the parties entered into the contract in the context of a highly-developed industry standard pricing model: netback pricing to a widely-traded market. The reasonable expectations of the parties align with the industry practice. Here, the widely-traded market is the West Coast market and the contract's pricing term provided a netback price referencing the interstate tariffs. The parties did not expect that the contract would be adjustable based on a change in the intrastate tariffs. Accordingly, we reverse the superior court's grant of summary judgment to Union Oil.

B.    **Tesoro Is Entitled To Summary Judgment Because There Is No Genuine Dispute Of Material Fact That The Contracts Contained A Netback Pricing Term.**

Having determined that summary judgment was improvidently granted to Union Oil, we must consider Tesoro's claim that it is entitled to judgment. Specifically, is there more than a scintilla of evidence that "reasonably tend[s]" to dispute Tesoro's position, thus creating a genuine dispute of material fact to defeat its motion for summary judgment?[22]  Remembering that the pricing scheme adopted in the contract — the netback approach — is not tied to actual costs, only TAPS tariffs, the question is whether any evidence raises a genuine issue of material fact as to Union Oil's argument on

---

[21]    *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993).

[22]    *See Philbin v. Matanuska-Susitna Borough*, 991 P.2d 1263, 1265-66 (Alaska 1999) (holding that to prevent summary judgment party must set forth specific facts showing admissible evidence could be produced reasonably tending to dispute movant's evidence).

appeal. We have thoroughly reviewed the record and conclude that no such genuine dispute of material fact exists.[23] Union Oil meets none of Tesoro's trade usage evidence. Union Oil's position is heavily reliant on affidavits crafted after litigation began, which detailed the subjective statements of the involved negotiators and Union Oil executives. These affidavits do not create a genuine dispute of material fact because "[e]xtrinsic evidence of parties' subjective intent, expressed during the course of litigation, does not establish an issue of fact regarding the parties' reasonable expectations."[24] Rather these affidavits are merely a restatement of the parties' positions in litigation.

No contemporary expression supports Union Oil's suggested interpretation. After the original contract with Tesoro was fully performed, a single internal Union Oil email was sent during negotiations for the second contract. This internal Union Oil email provided an outline of the contract stating "Tesoro will ship on Unocal [Pipeline]'s space . . . ([Union Oil] will reimburse Tesoro for pipeline tariff[.])" However, the email does not tend to reasonably dispute Tesoro's position that the term is a netback pricing term. First, it is an internal document that evidences only an employee's subjective view of the contract. Second, it is a late-arising outlier in conflict with every other Union Oil email referencing a netback pricing scheme. Third, it is silent as to whether the tariff

---

[23]    We also note that Alaska Civil Rule 56(c) directs a party opposing summary judgment to provide "a *concise* 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, *and* any other memorandum in opposition to the motion." (Emphasis added.)  This did not occur in this case.  Both parties submitted memoranda that supported their positions, but neither party submitted a concise statement of genuine issues.  Although we have completed an extensive review of the record, the parties would have benefitted from submitting such a statement, as each could have directed the review to their specific interpretations of the factual dispute.

[24]    *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 (Alaska 1991) (citing *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981)).

referenced is the interstate or the intrastate tariff. This email is insufficient to create a genuine dispute of material fact as it is not more than a scintilla of evidence.[25] Accordingly, Tesoro is entitled to judgment in its favor.

## V. CONCLUSION

Because we find that there is no dispute of material fact that the contract employed a netback pricing scheme subtracting interstate tariffs (and marine transportation costs) from a West Coast price to establish a North Slope price for the oil, we REVERSE the grant of summary judgment to Union Oil and REMAND for entry of judgment in favor of Tesoro. Given our holding we do not reach Union Oil's cross-appeal regarding the RCA-ordered interest because Union Oil is not entitled to any part of the RCA-ordered refunds.

---

[25] *See DeNardo v. Bax*, 147 P.3d 672, 680-82 (Alaska 2006) (holding that evidence appellant presented, including deposition testimony and affidavits, that conflicted in several respects with appellee's claims that she was afraid for her safety, was insufficient to produce a genuine dispute of material fact); *Yurioff v. Am. Honda Motor Co.*, 803 P.2d 386, 389 (Alaska 1990) (holding that there was no genuine dispute of material fact where plaintiff presented only one piece of evidence, his own deposition testimony, that an accident occurred within the statute of limitations).