*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MORRILL MAHAN, | ) | |
| | ) | Supreme Court No. S-15456 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-11-00497 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JESSICA MAHAN, | ) | |
| | ) | No. 6991 – March 27, 2015 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran, Judge.

Appearances: Richard W. Postma, Jr., Law Offices of Mitchell K. Wyatt, Anchorage, for Appellant. Shana Theiler, Walton, Theiler & Winegarden, LLC, Kenai, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

I.      INTRODUCTION

A husband and wife obtained a marriage dissolution that included a provision to split the "profits . . . after the cost of fuel and can[ne]ry dues" from their jointly owned commercial fishing boat. The ex-spouses dispute the meaning of the term "profits." Each party maintains that the other owes a large sum of money pursuant to the agreement. The superior court approved a standing master's recommendation that interpreted "profits" to mean "payment from the cannery, less deductions for fuel, dues

and other advancements." Because the superior court's findings regarding the parties' reasonable expectations at the time of the dissolution agreement are not clearly erroneous, and because the superior court's interpretation of the provision accurately reflects those expectations, we affirm.

## II.    FACTS AND PROCEEDINGS

Morrill and Jessica Mahan married in 2004 and dissolved their marriage in June 2011. During their marriage, the couple had one medically fragile child. Morrill was the primary wage-earner for the family. As reported in their petition for dissolution, Morrill's total gross wages for 2010 were $137,362.81 while Jessica's total gross wages were $16,716.21. In addition, the petition indicated that Morrill and Jessica had each received $31,292.14 in gross income in 2010 from their commercial fishing business.

The petition for dissolution included an addendum providing for the temporary maintenance of joint interests in the marital home and commercial fishing business. The parties agreed to maintain joint ownership of the marital residence and to split the profits from the commercial fishing business until October 2012, at which point Jessica was to take sole title to the home and Morrill was to take sole title to the commercial fishing boat and permit:

> The house and property will be owned jointly until 10/1/2012. The mortgage and utilities will be paid 50% by husband and wife. On 10/1/2012 the house will be paid by wife 100% and the house and property will be then turned over to the wife. The title will be solely in the wife's name. Household furnishings, everything in it will belong to wife.
>
> The commercial fishing boat will be owned jointly until 10/1/2012 and operated by the husband. The profits will be split equal between husband and wife after the cost of fuel and can[ne]ry dues. On 10/1/2012 the commercial fishing boat and permit will be then turned over to the husband. The title will be solely in the husband's name.

### A.     The Initial Dissolution Hearing

In June 2011 Magistrate Judge Jennifer Wells, serving as a standing master for the superior court, heard testimony from Morrill and Jessica before recommending that the superior court approve their dissolution. Morrill's and Jessica's testimony emphasized the connection between specific provisions of the agreement and the best interests of their child in light of her medical condition. Morrill and Jessica planned to rotate in and out of the marital home every two weeks so that their daughter would not need to travel back and forth between two homes. Morrill also agreed to remain named on the home mortgage even after the transfer of title to Jessica because she would be unable to obtain a low interest rate for the mortgage if she were to refinance on her own. Morrill testified that he intended to stay on the mortgage because "three percent interest . . . [is] hard to beat for [Jessica] and my daughter needs a place to live . . . ." Magistrate Judge Wells found that the dissolution agreement was fair and that Morrill and Jessica entered into the agreement freely and voluntarily. The superior court promptly approved the master's report and granted the dissolution.

### B.     Jessica's Motion To Enforce

Despite the amicable dissolution proceeding, Morrill and Jessica's post-dissolution relationship soon became more adversarial. In October 2011 Jessica filed her first motion for an order enforcing the dissolution decree. The motion alleged that Morrill was impermissibly removing from the home property that belonged to Jessica under the terms of the dissolution agreement. At the evidentiary hearing related to her motion to enforce, Jessica also alleged that Morrill had not paid her the 50% share of the 2011 commercial fishing profits to which he had agreed. The standing master's report concluded that Morrill was obligated to pay Jessica half of the 2011 commercial fishing income from the cannery, less fuel and dues, immediately.

Morrill immediately objected to the master's report, arguing that the word "profit" meant "the positive income left after subtracting expenses from revenue," and that he was not afforded an opportunity to subtract his expenses other than fuel and cannery dues. He asserted that typical additional expenses included "pay[ing] deckhands," as well as "supplies, gear, bait, etc.," and that he typically spends "thousands of dollars in preseason costs . . . out of pocket before the boat even gets in the water."

Superior Court Judge Anna Moran conducted a de novo review and approved the master's report. Addressing Morrill's objection, the superior court found "that Master Wells reasonably concluded Mrs. Mahan was to receive 50% of 2011 income from cannery income less deductions for fuel, dues and other advancements" and ordered payment of that amount. Following the order, Morrill made a one-time $15,000 payment to Jessica. But Morrill now characterizes this payment as an "advance" that did not "account[] for Jessica['s] share of expenses."

### C. Jessica's Motion To Show Cause And Morrill's Cross-Motion For Money Judgment

In July 2013 Jessica filed a motion to show cause alleging, among other grievances, that Morrill had "failed to pay any funds towards the 2012 fishing money owed or demonstrate [that] he fully paid her portion of 2011 funds." In opposition, Morrill filed a cross-motion for money judgment and asserted for the first time that the total fishing losses in 2011 and 2012 amounted to $96,826. He requested a judgment in the amount of $48,413 — half of the total losses. Jessica responded that Morrill in fact owed her $49,079 as her share of the 2011 and 2012 fishing profits.

After hearing additional testimony from Morrill and Jessica, Magistrate Judge Wells issued another report, which noted that the term "profits" already had been defined in her previous report and had been reviewed de novo by the superior court

following Morrill's objection in 2012. Nevertheless, Magistrate Judge Wells held an additional evidentiary hearing and issued a new series of findings in a master's report, which concluded that "[t]here is virtually nothing in the contract's purpose, the extrinsic evidence, or the contract's written terms, to support Mr. Mahan's interpretation." The report recommended that the superior court "continue to use its prior definition of this term." In January 2014 the superior court approved the master's report and ordered that the term "profits" continue to be defined as "payment from the cannery, less deductions for fuel, dues and other advancements." Morrill appeals.

## III.   STANDARD OF REVIEW

"Contract principles govern the interpretation of property settlement agreements incorporated in dissolution decrees. When interpreting any contract, the goal is to give effect to the reasonable expectations of the parties. We review the interpretation of a contract de novo. Where the superior court considers extrinsic evidence in interpreting contract terms, however, we will review the superior court's factual determinations for clear error and inferences drawn from that extrinsic evidence for support by substantial evidence."[1]

## IV.   DISCUSSION

The sole issue on appeal is the superior court's interpretation of "profits" to mean "payment from the cannery, less deductions for fuel, dues and other advancements." Morrill contends that the definition of "profits" is unambiguous and means "net profits," or "the excess of revenues over expenditures." He argues that the superior court erred by failing to apply this definition when it approved the standing master's report. Morrill also alleges that Jessica was a partner in the commercial fishing

---

[1]    *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012) (internal quotation marks and citations omitted).

business. Citing his 2011 and 2012 federal income tax returns, Morrill asserts that the commercial fishing business operated at a loss, and he argues that Alaska partnership law requires Jessica to pay a 50% share of the business's alleged losses in 2011 and 2012.[2]

In the alternative, Morrill argues that even if the definition of "profits" is ambiguous, AS 25.24.220(g) "prohibited [the trial] court from using principles of contract interpretation to modify a dissolution agreement" without the consent of both ex-spouses. Finally, Morrill argues that even if the fishing profits provision is ambiguous and the superior court had authority to resolve that ambiguity, it erred by relying on impermissible self-serving testimony from Jessica about her subjective intent as extrinsic evidence. He asserts that the superior court should have instead resolved any ambiguity in favor of his definition. But as Magistrate Judge Wells concluded, "[t]here is virtually nothing in the contract's purpose, the extrinsic evidence, or the contract's written terms to support Mr. Mahan's interpretation."

## A. The Definition Of "Profits" In The Context Of The Commercial Fishing Provision Of The Dissolution Agreement Is Unambiguous.

"We examine 'both the language of the [agreement] and extrinsic evidence to determine if the wording of the [agreement] is ambiguous.' "[3] Although Morrill argues that extrinsic evidence may only be considered if the plain language of an

---

[2]    While Morrill argued below that the commercial fishing business operated as a partnership, he did not raise this argument on appeal until his reply brief. It is well established that "issues not argued in opening appellate briefs are waived." *See Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010). Even if Morrill's partnership argument was not waived, it would not succeed because the only evidence supporting the existence of a partnership was the joint ownership of the fishing boat. AS 32.06.202(c)(1) provides that joint ownership of an asset "does not by itself establish a partnership, even if the co-owners share profits made by the use of the property."

[3]    *Villars*, 277 P.3d at 768 (alteration in original) (quoting *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005)).

agreement reveals ambiguity, that is not the law in Alaska.[4] Rather, "[e]xtrinsic evidence may always be received on the question of meaning."[5]

Morrill argues that the term "profit" is so well defined, in both ordinary and technical usage, as "total revenue minus total expenditures" that no other definition could possibly reflect the reasonable expectations of the parties. But while total revenue minus total expenditures may be a common meaning of the term "profit," it is by no means the only definition. Moreover, interpretation of a contract term does not take place in a vacuum, but rather requires consideration of the provision and agreement as a whole.[6] With that principle in mind, our starting place is the commercial fishing provision of the dissolution agreement, which provides:

> The commercial fishing boat will be owned jointly until 10/1/2012 and operated by the husband. The profits will be split equal between husband and wife after the cost of fuel and can[ne]ry dues. On 10/1/2012 the commercial fishing boat and permit will be then turned over to the husband. The title will be solely in the husband's name.

Read as a whole, the commercial fishing provision undermines Morrill's position. If the term "profit" already contemplated subtraction of all expenditures, then

---

[4]     *See Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n.1 (Alaska 1982) (rejecting a two-step approach to plain language and extrinsic evidence in contract interpretation and noting that its application was "artificial and unduly cumbersome," and "that it offers no advantage over [an approach] which initially turns to extrinsic evidence for such light as it may shed on the reasonable expectations of the parties").

[5]     *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 584 (Alaska 1989) (citing *Alyeska Pipeline*, 645 P.2d at 771 n.1).

[6]     *See Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1024 (Alaska 1986) ("The parties' reasonable expectations are assessed through resort to the language of the disputed provision and other provisions of the contract . . . ." (citing *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981))).

there would be no reason to specify that specific expenses such as fuel costs and cannery dues were to be subtracted. The maxim of construction *expressio unius est exclusio alterius* applies when "parties list specific items in a document" and instructs that "any item not so listed is typically thought to be excluded."[7] This principle suggests that expenditures other than fuel and cannery dues were not intended to be included because the parties did not list them. Our "preferred method of interpreting contracts is to reconcile conflicting terms in a way that gives effect to them all,"[8] and it is the superior court's interpretation of "profits" — not Morrill's — that best achieves this end.

The interpretation of "profits" to mean fishing income finds substantial support in the extrinsic evidence findings made by Magistrate Judge Wells and relied upon by the superior court. The relevant findings are as follows:

> 7. . . . [Ms. Mahan] argues that this agreement was designed to give her extra income flow in the short term, recognizing the income disparity between the parties.
>
> . . . .
>
> 11. . . . [A]t the time of the dissolution, Mr. Mahan reported an adjusted annual income of $129,649. Ms. Mahan reported an adjusted annual income of $47,432. In the petition, each party reported that they received $31,292 in fishing income.
>
> 12. This income disparity has widened. Mr. Mahan continues to commercial fish and work lucrative jobs with employers such as Conoco Phillips and Chugach Electric. Ms. Mahan no longer receives commercial fishing income, and does not enjoy lucrative employment.

---

[7] *Tesoro Alaska Co. v. Union Oil Co. of California*, 305 P.3d 329, 334 (Alaska 2013) (quoting *Bentley Mall Assocs. v. ADC Distrib. Corp.*, Mem. Op. & J. No. 865, 1997 WL 33812770, at *1 (Alaska Oct. 15, 1997)).

[8] *Hussein-Scott v. Scott*, 298 P.3d 179, 182 (Alaska 2013).

13. The parties' tax returns[] regarding the fishing business show the following:

| Year | Loss | Profit |
|------|------|--------|
| 2012 | $78,462 | |
| 2011 | $18,364 | |
| 2010 | | $3,874 |
| 2009 | $24,933 | |
| 2008 | $33,724 | |
| 2007 | $36,251 | |
| 2006 | $28,255 | |
| 2005 | $32,847 | |

14. Ms. Mahan argues that the parties historically used the fishing business as a tax shelter. The reported profit and losses tend to corroborate this testimony.

15. Given the parties' disparate incomes, cooperative agreements, and desire to work together for [their daughter's] ongoing security and stability, it is hard to imagine that they intended Ms. Mahan to pay Mr. Mahan 50% of whatever loss he reported on his tax return. . . .

16. . . . [T]he dissolution petition reflected more than $32,000 in actual income to each party from the 2010 fishing business — yet the tax return reported a $3,874 . . . profit. This difference suggests that the parties had a shared view of the [business] as an income [tax] shelter, and the check from the cannery as income.

. . . .

18. . . . This particular contract seems clear. The parties stated "profit." They did not, either in writing or at the hearing, state that they intended to share "profit and loss." Additionally, they did not reference the tax returns. Instead, their language references the cost of fuel and cannery dues which is consistent with the fact that, at the end of the fishing season, the cannery writes a check to a fisherman less these amounts.

19. There is virtually nothing in the contract's purpose, the extrinsic evidence, or the contract's written terms, to support Mr. Mahan's interpretation.

There is ample evidence to support these findings, and the findings reinforce the conclusion that the parties intended to split the income derived from Morrill's commercial fishing less costs for fuel and cannery dues. Morrill and Jessica entered into other cooperative agreements to provide for their daughter at the time of the dissolution, which supports the inference that two years of shared fishing money was designed to provide temporary support to Jessica in her role as their daughter's primary caregiver and not designed to create a financial business-focused burden both parties knew Jessica would be unable to repay. Elsewhere in the dissolution agreement the parties asserted that the fishing business provided $31,292 in income to Jessica in 2010, and nowhere in the agreement do the parties refer to the tax returns indicating a history of commercial fishing losses. Instead, the dissolution agreement acknowledges only the positive income provided by the commercial fishing.

Finally, our inquiry seeks "to give effect to the reasonable expectations of the parties" at the time of the agreement.[9] With this in mind, it is noteworthy that Morrill did not assert his belief that the agreement was intended to provide for the sharing of both losses and profits until two years after the agreement was entered.

Morrill suggests that the magistrate judge and the superior court made inappropriate use of Jessica's testimony in their findings. He alleges that "both [Magistrate Judge Wells and Judge Moran] relied entirely upon Jessica's self-serving testimony" in their respective analyses. But a party may "testify[] about its understanding in objective terms . . . sufficiently detailed to enable [the] trier of fact to

---

[9] *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012).

form its own judgment as to the reasonableness of the party's understanding and the likelihood that the other party would have the same understanding."[10]

Here, the language of the findings makes clear that Magistrate Judge Wells did not rely solely on Jessica's testimony. For example, Magistrate Judge Wells's finding of an income disparity between the parties was based on details recorded in the dissolution agreement itself. And the parties' 2011 and 2012 tax returns corroborate the testimony from both parties at the initial dissolution proceeding that providing short-term financial support for Jessica was in the best interests of their child. Moreover, it was not unreasonable for Magistrate Judge Wells to draw an inference from the consistent tax losses recorded in Morrill and Jessica's pre-dissolution tax returns that the commercial fishing business was used as a tax shelter. Magistrate Judge Wells's inference that it is unlikely that the parties "intended Ms. Mahan to pay Mr. Mahan 50% of whatever loss he reported on his tax return" is supported by both Morrill's and Jessica's testimony at the initial dissolution hearing in 2011 — testimony that provides the best window into the parties' understanding of the agreement at the time it went into effect. The findings also rely on undisputed testimony from Jessica regarding how the cannery typically paid fishermen.

Contrary to Morrill's alternative argument that the superior court improperly modified the terms of the dissolution agreement, "interpret[ing] a property

---

[10] *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 317 (Alaska 2013) (second alteration in original) (quoting *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1067 (Alaska 1998)); *see also Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1003 (Alaska 2004) ("Testimony of a party as to his subjective intentions concerning the meaning of a particular clause in a contract is not probative unless the party in some way expressed or manifested his understanding at the time of contract formation.").

agreement's provisions to clarify confusing language and resolve ambiguity"[11] is not only appropriate, but "required under our case law"[12] because "[an] agreement entered into in connection with a dissolution proceeding is a contract subject to interpretation under contract principles."[13]  Thus, in our independent judgment, the plain text of the dissolution agreement's commercial fishing provision and the extrinsic evidence both support the conclusion reached by the superior court.

Because the superior court's factual findings are not clearly erroneous and its inferences drawn from extrinsic evidence are otherwise supported by substantial evidence, and because the plain text of the dissolution agreement supports the superior court's interpretation, we affirm the superior court's interpretation of the contract terms.

## V.      CONCLUSION

We AFFIRM the superior court's order interpreting "profits" to mean "payment from the cannery, less deductions for fuel, dues and other advancements."

---

[11]      *Song v. Song*, 972 P.2d 589, 593 (Alaska 1999).

[12]      *McCarter v. McCarter*, 303 P.3d 509, 514 (Alaska 2013).

[13]      *Knutson v. Knutson*, 973 P.2d 596, 600 (Alaska 1999).