NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL F. HUGHES, | ) | |
| | ) | Supreme Court No. S-18430 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-09701 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| DARLENE D. PERKINS, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2032 – May 22, 2024 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: John C. Pharr, Law Offices of John C. Pharr, P.C., Anchorage, for Appellant. Kara A. Nyquist, Nyquist Law Group, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

# I. INTRODUCTION

A divorcing couple reached a settlement agreement dividing their marital estate. The superior court adopted this agreement as the final division of marital property. After the husband repeatedly frustrated the agreement, the wife asked the court to enforce its terms. The court issued several orders enforcing the agreement. The husband now appeals, arguing that the enforcement orders constituted

---

\*        Entered under Alaska Appellate Rule 214.

impermissible modifications of the agreement. He additionally argues that the court erred in concluding that there would be no adverse tax consequences created by the property distribution. We disagree with the husband's arguments and affirm the orders of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

After marrying in 2011, Darlene Perkins and Michael Hughes jointly operated a flightseeing business. In 2018 Perkins filed for divorce. After extensive mediation the couple reached a settlement agreement: Perkins agreed to assume all assets and liabilities of the business and to obtain a $1.1 million Small Business Administration (SBA) loan to finance an equalization payment and buy out Hughes's share.

The superior court incorporated the parties' agreement into its findings of fact and conclusions of law in December 2020, providing that the property division in the agreement would function as the final division of marital property in the divorce. The couple subsequently reached an additional settlement agreement clarifying the implementation of the first agreement. The first agreement provided that the parties would adopt a "commercially reasonable timeline" for transfer of the business to Perkins, which the subsequent agreement specified would be "on or before March 15, 2021," based on a broker's estimate that it would take 60 to 90 days to secure the SBA loan. This March 15 closing deadline for the loan was also referenced explicitly in the court's findings of fact and conclusions of law.

Both agreements contained multiple provisions requiring the parties to act in good faith in cooperating to transfer the business to Perkins and secure the loan. The first agreement provided that Perkins and Hughes "will cooperate in securing financing and transferring ownership," further requiring Hughes to "assist with the transition of ownership and operations." The agreement separately provided that Perkins and

Hughes would "act in good faith and use their best efforts to implement this agreement." The subsequent agreement further provided that "[n]either party will act to delay financing."

### B. Proceedings

Shortly after the agreements were finalized, Perkins filed the first of several motions to enforce the agreements. Another motion to enforce by Perkins followed shortly after the first was granted. Perkins next filed a motion to remove Hughes from day-to-day business operations in April 2021, asserting that Hughes had failed to comply with prior court orders and requesting an extension of the closing date of the loan. The court granted this motion, ordered Hughes removed from business operations, and extended the loan closing date to September 30, 2021. Perkins closed on the loan and deposited the $1.1 million equalization payment in Hughes's attorney's trust account on October 1.

Perkins filed another motion later that month requesting the court take additional steps to enforce its orders. Specifically, Perkins sought offsets against the $1.1 million equalization payment in light of undisclosed business liabilities, unauthorized spending by Hughes, and earlier payments to Hughes. In total, Perkins argued that she was owed $174,379.27 in offsets. Hughes responded by contending that Perkins's requested offsets would "constitute tax fraud" and claiming that he owed only $100 in offsets.

In response to this motion, the superior court ordered both Hughes and his counsel to file affidavits "stating exactly what amounts from the $1.1 million settlement payment from [Perkins] have been distributed; the dates, amounts, and recipients of all such distributions; and, the exact amounts of how much remains" in the relevant bank and trust accounts. The court explained at a subsequent status hearing that it was surprised to learn that some or all of the $1.1 million had been disbursed to Hughes instead of remaining in his counsel's trust account pending resolution of the offsets.

The court accordingly ordered Hughes to prepare an affidavit accounting for the $1.1 million. Hughes moved for reconsideration, explaining that his personal bank account contained $174,832.86 and that more detail was unnecessary. The court denied reconsideration.

Hughes's accounting revealed that he had transferred $550,008 of the $1.1 million to his son Duncan Hughes on January 14, 2022, seven days *after* the court ordered an accounting. The court ordered Duncan to show cause and appear to explain where the money went. Duncan testified that the bulk of the money had been used to purchase a boat in Grenada, but that $168,996.31 remained as a cashier's check. The court ordered Duncan to convey the check to the trust account of his father's lawyer.

Expressing concern that money was "seemingly going hither and yon," the court suggested that Hughes put an additional $90,000 in his attorney's trust account until the offsets were resolved. Hughes explained he could not practically put that amount into the trust account, but offered to place a lien for that amount on his boat in Grenada. The court rejected Hughes's proposal and instead ordered a $90,000 lien placed on an aircraft that Hughes owned in Alaska.

The court heard testimony and closing arguments in May 2022. The court ruled in favor of Perkins on all issues. The court found that Hughes "either had buyer's remorse or perhaps just a dark heart," and that he had "repeatedly, consistently and intentionally made final resolution of the required equalization as difficult as possible, every step of the way." The court observed that Hughes had "a long history of noncompliance with the parties' agreements," which necessitated the court's additional orders enforcing those agreements.

The court found that Hughes' testimony "often lacked credibility, . . . that his behavior was repeatedly and consistently inexcusable, and that he intentionally inflicted pain on Ms. Perkins and her daughter and son-in-law." The court ruled against Hughes on all tax issues, observing that his tax expert "seemed to be trying to *cause* as

much tax trouble for Ms. Perkins as possible" and "as an expert and an attorney should have known better."[1]

The court found that "[a]ll offsets are the result of Mr. Hughes' non-compliance with the parties' agreements and numerous orders of this court," and ordered Hughes to reimburse Perkins a total of $128,221.63 in offsets. The court also found that this case "screams out for a fee enhancement, due to Mr. Hughes' frivolous and vexatious conduct," and awarded full reasonable attorney's fees and costs related to post-settlement litigation to Perkins.

Hughes appeals.

## III. STANDARD OF REVIEW

"We determine de novo whether a superior court order modifies a final decree or merely enforces it."[2] An order enforcing a final decree is reviewed for abuse of discretion.[3] A decision constitutes abuse of discretion if it is arbitrary, capricious, manifestly unreasonable, or stems from an improper motive.[4]

"We evaluate de novo . . . the meaning of federal statutes."[5]

## IV. DISCUSSION

Hughes argues the superior court improperly modified the settlement agreements in three ways: (1) extending the time for closing on the loan; (2) ordering an accounting; and (3) ordering him to post security to ensure Perkins could collect on

---

[1]     Emphasis in original.

[2]     *del Rosario v. Clare*, 378 P.3d 380, 383 (Alaska 2016).

[3]     *Id.*

[4]     *Id.* (quoting *Gunn v. Gunn*, 367 P.3d 1146, 1150 (Alaska 2016)).

[5]     *Native Vill. of Chignik Lagoon v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 518 P.3d 708, 712 (Alaska 2022) (quoting *State v. Native Vill. of Tanana*, 249 P.3d 734, 737 (Alaska 2011)).

a judgment arising out of the division of the marital estate. We conclude that the court did not abuse its discretion when it entered these orders.

Hughes also argues that the court erred in its ruling on the tax consequences of the agreement. This argument is unavailing.

### A. The Superior Court's Orders Were Permissible Measures To Enforce The Settlement Agreement.

None of the superior court orders that Hughes challenges on appeal constitute impermissible modifications of the settlement agreement. "[W]hen a party brings a motion to enforce a divorce decree, '[t]he superior court has inherent power, and also the duty[,] to enforce its divorce decrees.' "[6] This power and duty applies when the court is "enforcing its final decree [which consists of] the parties' settlement [that it had] explicitly merged into its decree."[7] This power applies here because all of the orders that Hughes challenges fall within the inherent authority of the court to enforce the property settlement agreement, the terms of which it adopted as its final division of marital property.

#### 1. Order extending the closing date for the SBA loan

The superior court did not err in extending the time for closing on the $1.1 million SBA loan. Although the agreement provided that the parties would "establish a commercially reasonable timeline" to obtain the loan, which they defined as March 15, 2021, the court granted an extension to September 30, 2021. In requesting this extension, Perkins explained that delays caused by "Mr. Hughes' non-compliance with the parties' agreements and court orders" had disrupted the agreed-upon timeline.

---

[6] *Horchover v. Field*, 964 P.2d 1278, 1285 (Alaska 1998) (second alteration in original) (quoting *Cedergreen v. Cedergreen*, 811 P.2d 784, 786 (Alaska 1991)).

[7] *Id.* (alterations in original) (quoting *Cedergreen*, 811 P.2d at 786).

Hughes argues that this extension violated the terms of the agreement and that the court lacked the authority to modify the agreement.[8] We conclude that the court's order was a permissible measure to enforce the agreement and give effect to the reasonable expectations of the parties. The order did not modify the agreement or impose any additional terms.

The first agreement provided that closing would occur on a "commercially reasonable timeline." The subsequent clarifying agreement specified that both parties anticipated that closing would occur "on or before March 15, 2021." It also provided that both parties would "cooperate in securing financing," that Hughes would "assist with the transition of ownership and operations," and that both parties would "act in good faith and use their best efforts to implement this agreement."

The court's order extending the closing date reflected its conclusion that the March 15 date was no longer reasonable in light of Hughes's repeated breaches of the agreement. The court found that "the *only* reason the deadline had to be extended for Ms. Perkins to obtain the SBA loan was because of Mr. Hughes' obstructionist and bad faith tactics."[9] Perkins was unable to meet the deadline because Hughes was "actively hiding information" necessary to obtaining the loan, exhibiting "continuous non-compliance" that "directly jeopardized the closing of the SBA loan."

---

[8] Perkins contends this issue is not timely presented because Hughes failed to seek review of the May 2021 order extending the loan closing date. But we are not convinced the superior court's one-sentence order extending the closing date, which did not include factual findings, legal analysis, or any language characteristic of a final judgment, was an appealable final judgment within the meaning of Alaska Appellate Rule 202(a). *Cf. BBFM Eng'rs, Inc. v. McDonald*, 530 P.3d 352, 357 n.13 (Alaska 2023). We therefore consider Hughes's argument on the merits.

[9] Emphasis in original.

When the superior court adopted the agreement, it acquired the same powers to enforce the agreement as it would have to effectuate any other final decree.[10] The court appropriately carried out its "duty to make its decrees effective and to prevent evasions thereof."[11]  Under these facts, we reject the argument that the court abused its discretion.  The court suitably interpreted the agreement to "give effect to the reasonable expectations of the parties."[12]

### 2.  Order requiring an accounting

The superior court did not err in requiring Hughes to provide an accounting of the $1.1 million equalization payment.  Hughes contends that the court's order, which required him to file an affidavit detailing how much of the $1.1 million equalization payment had been distributed, the dates, amounts, and recipients of such distributions, and how much remained in any relevant bank or trust accounts, amounted to enforcing "a term which was never part of the agreement."

The authority to order an accounting falls well within the inherent power of the superior court to enforce its orders.  While we have acknowledged that such orders "may appear as an additional requirement," we have concluded that one-time accounting orders can be a "reasonable, and least costly, way of ensuring that [a party] is honoring the court's decree."[13]  We have specifically noted that such orders may be justified in light of a party's "demonstrated willingness to ignore his obligations under

---

[10]     *See O'Link v. O'Link*, 632 P.2d 225, 228 (Alaska 1981) ("A property division incorporated within a divorce decree is a final judgment and is modifiable to the same extent as any equitable decree of the court.").

[11]     *Johnson v. Johnson*, 544 P.2d 65, 72 (Alaska 1975) (quoting *Goodsell v. Goodsell*, 228 P.2d 155, 157 (Wash. 1951)).

[12]     *Mahan v. Mahan*, 347 P.3d 91, 94 (Alaska 2015) (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[13]     *Horchover v. Field*, 964 P.2d 1278, 1284-85 (Alaska 1998).

the agreement."[14] In light of the court's finding that Hughes "has a long history of noncompliance" in this proceeding, we see no error in the court's decision to require an accounting to ensure sufficient funds would be available to satisfy the court's order on the disputed offsets.[15]

### 3. Order requiring money to be placed in escrow

We likewise see no error in the court's decisions to order Duncan Hughes to deposit a cashier's check worth $168,996.31 in Michael Hughes's attorney's trust account, order Hughes's attorney not to disburse that amount to Hughes, and place a $90,000 lien on Hughes's airplane. Hughes contends that the agreement contained no language about escrow, and that the court's order was "retroactively changing the agreement." But "creative suggestions [for providing security] . . . come within the ambit of the superior court's discretion,"[16] particularly where, as here, one party has significant assets in a foreign country that the other party may be unable to collect on. The superior court found that Hughes and his son "were together actively trying to hide funds and other items from Ms. Perkins and this court," and that Hughes was "intentionally defiant regarding . . . this court's efforts and orders." The court's order for Hughes to place funds in escrow was a reasonable response to his efforts to conceal assets.

---

[14] *Id.* at 1285.

[15] This order was particularly reasonable in light of Hughes's decision, shortly *after* the court ordered an accounting, to withdraw $550,000 of the $1.1 million, the bulk of which was used to purchase a boat in a foreign country.

[16] *Money v. Money*, 852 P.2d 1158, 1163 (Alaska 1993).

**B.    The Superior Court Did Not Err In Its Ruling On The 2020 Tax Liability.**

Hughes argues that the superior court erred when it rejected his claim that Perkins was required to pay him $105,000 in business income from the 2020 tax year.[17] Hughes points out that the agreement required him to pay taxes on half of the profits from the flightseeing business.  He argues that, because the court declined to order Perkins to distribute half of the business's tax year 2020 profits to him, the court effectively required him to "pay taxes on income he did not receive."  In his view, he should not have had to pay taxes on business profits unless they were distributed to him personally.  This argument is baseless.

In general, trial courts are obligated to consider the "immediate and specific tax liability" created by the division of property in a divorce,[18] but they are not required to consider "speculative tax consequences that may arise."[19]  The party arguing that a tax consequence will arise bears the burden of proving that "a taxable event will occur in connection with the division of property."[20]

The Internal Revenue Code does not require partnerships to pay out exact proportional shares of their profits to partners.  Under the Code, partnerships are not themselves taxable entities and do not pay federal income taxes; instead, partners are "separately or individually liable for income taxes on their distributive share of partnership items."[21]  The "distributive share" is a partner's proportional share of the

---

[17]    Although Hughes does not clearly tie this argument into the claims addressed above, presumably he seeks to reduce or eliminate the offset he owes to Perkins.

[18]    *Oberhansly v. Oberhansly*, 798 P.2d 883, 884 (Alaska 1990).

[19]    *Dundas v. Dundas*, 362 P.3d 468, 477 (Alaska 2015).

[20]    *See Oberhansly*, 798 P.2d at 887.

[21]    *Cent. Valley AG Enters. v. United States*, 531 F.3d 750, 755 (9th Cir. 2008).

partnership's profits and losses.[22]  Unless they agree otherwise, equal partners are entitled to share equally in the profits of a partnership, but the Code does not require actual cash distributions to partners based on their distributive shares.[23]

As Perkins's expert testified, it is not unusual for a partnership to keep some of its profits in the business to pay for anticipated future expenses.  If profits are kept in the partnership, the amount actually distributed to partners would decrease, but the distributive shares would remain the same.[24]  Partners are obligated to pay taxes on their distributive share regardless of the amount of profits that are actually distributed.[25]  Contrary to Hughes's repeated suggestion, this practice does not constitute tax fraud.

## V.   CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[22]   *See* 26 U.S.C. § 704(b).

[23]   *See id.*  At trial Hughes's tax expert cited *Holdner v. Commissioner*, 100 T.C.M. (CCH) 108 (2010), *aff'd*, 483 F. App'x 383 (9th Cir. 2012), for the proposition that business profits in an equal partnership ought to be allocated equally.  While *Holdner* supports that proposition, nothing in the decision suggests partners are entitled to have half the profits paid out in cash.

[24]   Hughes briefly suggests that Perkins claimed "she was entitled to receive the full $172,282," or half of the 2020 profits, in cash, but there is no indication that Perkins actually received a larger cash payout than Hughes:  Her tax expert testified that her 2020 distributions "were even less than Mr. Hughes['s]."

[25]   *See* 9 SCOTT SHIMICK, MERTENS LAW OF FEDERAL INCOME TAXATION § 35B:1 (West 2023).