Warren D. OBERHANSLY, Appellant,

v.

Charlene C. OBERHANSLY, Appellee.

No. S-3433.

Supreme Court of Alaska.

Sept. 14, 1990.

R. Sam Pestinger, Anchorage, for appellant.

Laurel J. Peterson, P.C., Law Offices of Laurel J. Peterson, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Warren Oberhansly challenges the superior court's division of property in this marriage dissolution proceeding on two grounds. Warren argues first that the court's unequal division of property should be overturned under AS 25.24.160(a)(4) because it is based in part on his "fault" in allowing marital debts to fall in arrears. Warren also maintains that the division of property must be reversed because the court failed to consider the tax consequences of its order to Warren to withdraw funds from his retirement account.

We find no error in the court's decision to order an unequal division of property in part on the basis of Warren's conduct in

allowing marital debts to go in default after separation. This is perfectly appropriate under the *Merrill* factors. However, we believe the division of property must be reversed because the court failed to consider the tax consequences of distributing funds from Warren's retirement account. Where, as in this case, the division of property will create an immediate and specific tax liability, the trial court must consider that liability in deciding on an equitable division.

## I.

Charlene and Warren Oberhansly were married on May 29, 1969. Charlene and Warren separated permanently in September 1988. Warren has worked as a driller on oil rigs for the last fifteen years. Except for 1987 when he was laid off, Warren has earned between $87,000 and $93,000 a year since 1984. Throughout the marriage, Charlene had various part-time jobs. Currently, Charlene is a secretary for several supervisors at Alaska Cold Storage. In 1988, Charlene earned $23,615.

After the separation in September 1988, Warren left Charlene in dire financial circumstances. Warren left Charlene without access to their savings account, their joint checking account, or Warren's personal checking account. Warren stopped making payments on the mortgage on the family home in Anchorage. Although he withdrew over $12,000 in October 1988 from his retirement account with Grace Drilling in order to cure the impending default on the home, he did not use the money for that purpose. As a result, the bank foreclosed and the home was sold. In addition, Warren stopped making payments on the mortgage on a separate piece of income property in Utah. Warren also stopped making payments on a consumer loan with the National Bank of Alaska as well as Charlene's Visa card, both of which went into default.

After a trial, the court issued its Memorandum of Decision incorporating findings of fact and conclusion of law on May 12, 1989. The court ordered an unequal distribution of the marital assets and debts on the basis of Warren's superior earning power, his conduct during the parties' separation, and Charlene's financial circumstances. The court awarded Charlene $78,875 of the marital property and assigned her $965 of the marital debts. The court awarded Warren $50,737 of the marital property and assigned him $13,331 of the debts. The largest asset divided was Warren's retirement account. The court awarded Charlene two-thirds of this account or $58,275 and ordered Warren to "immediately begin withdrawal procedures and pay to the offices of [Charlene's] counsel said funds...." Although Warren asked the court to make a finding concerning the tax consequences of ordering this withdrawal, the court refused his request on grounds of insufficient evidence. Because of Charlene's difficult financial circumstances, the court also awarded Charlene temporary spousal support of $500 a month for three years. The court issued final judgment on June 2, 1989. Warren appealed the court's division of property as well as its award of spousal support.[1]

## II.

The division of property in a divorce proceeding is governed by AS 25.24.-160(a)(4). This statute provides in relevant part that the superior court may divide the property "whether joint or separate, acquired only during coverture, in the manner as may be just, and without regard to which of the parties is in fault." AS 25.24.-160(a)(4). In determining a just division of property, the court must consider the following factors established in *Merrill v. Merrill*, 368 P.2d 546 (Alaska 1962), and elaborated on in *Lang v. Lang*, 741 P.2d 1193 (Alaska 1987):

> The principal factors to be weighed by the court in reaching an equitable division are: the parties' respective ages, earning capacities, stations in life, health

---

1. Warren's challenge to the spousal support award is frivolous. Warren waived any right to challenge the award as an abuse of discretion by voluntarily stipulating to such an award in open court. Civil Rule 81(e); *Interior Credit Bureau, Inc. v. Bussing*, 559 P.2d 104, 106 (Alaska 1977).

and physical condition, conduct during the marriage, and circumstances and needs; the duration of the marriage, and the parties' financial circumstances, including the time and manner of acquisition of the property in question, its value at the time of the division, and its income producing capacity, if any. *Merrill*, 368 P.2d at 547–48 n. 4. This enumeration is not exhaustive and the trial court need not make findings pertaining to each factor, *id.* at 548 n. 10; *Brooks v. Brooks*, 677 P.2d 1230, 1233 (Alaska 1984), but the findings must be sufficient to indicate the factual basis for the conclusion reached. *Id.*

741 P.2d at 1195–96 (footnote omitted). "Given adequate factual findings, and a demonstration that the trial court weighed those facts in reaching its conclusion, we will not overturn a property division unless it is clearly unjust." 741 P.2d at 1196 (quoting *Wanberg v. Wanberg*, 664 P.2d 568, 574 n. 20 (Alaska 1983)).

The superior court in this case properly adhered to this procedure. The court wrote: "To the extent this property division is unequal, I have considered Mr. Oberhansly's far superior earning power, his conduct during the parties' separation, his wife's financial circumstances as reasons for giving her more marital property than I have awarded to him. The unequal division of debts is made for the same reasons."

Warren challenges the unequal property division on the ground that the court improperly based the division, in part, on fault. Warren claims that the superior court "misconstrued" the intent behind the "conduct of the parties during the marriage" factor when it, in effect, "penalized [him] by assuming that he intentionally placed the parties' residence in foreclosure."

In fact, it is Warren who misconstrues the legislature's reference to fault in AS 25.24.160(a)(4). We recently reiterated that the statute's prohibition of any consideration of fault in the division of property refers only to the fault as to the breakdown of the marriage. "Under the concept of no-fault divorce, a court cannot rely on one party's fault in ending the marriage to justify[ ] awarding a greater portion of the marital property to the other spouse." *Hartland v. Hartland*, 777 P.2d 636, 642 (Alaska 1989). We consistently have considered the conduct of the parties with respect to the marital property and debts after separation a relevant factor in determining a just division. In *Hartland*, we held that the superior court "reduced [the husband's] share for the entirely appropriate reason that he dissipated substantial amounts of marital assets for his own benefit during the parties' separation." *Id.* (footnote omitted). In *Moore v. Moore*, 499 P.2d 300 (Alaska 1972), we found that the trial court properly considered the wife's fault in appropriating $13,000 after separation. 499 P.2d at 303 n. 3.

In this case, the superior court properly considered Warren's fault in allowing most of the household debts to fall in default and in paying personal debts out of marital assets. These findings are all adequately supported in the record. As in *Hartland* and *Moore*, Warren unfairly appropriated marital property after separation. Given this conduct, as well as his superior earning capacity and Charlene's difficult financial circumstances, we hold that the court's unequal division of property was not clearly unjust.

### III.

The largest community asset in this case is Warren's retirement account with Grace Drilling. At trial, Warren testified that he would have to pay federal income tax on any distribution of funds from the account. Counsel for Charlene agreed that taxes would have to be paid on the distribution, but maintained that Charlene would be taxed on the portion of the account distributed to her. The court recognized that tax consequences would substantially alter the effective distribution of property, but refused to make a finding on tax consequences because it believed that Warren's testimony was an insufficient basis for such a finding. The court then ordered that $58,275 or two-thirds of the account be withdrawn and distributed to Charlene.

Warren alleges that the court abused its discretion in determining an equitable division of property without considering the tax consequences of cashing out his retirement account. Charlene counters that the court's decision to refuse to make a finding on the basis of Warren's "Expert testimony" was well within its discretion.[2]

Charlene's argument depends on the false assumption that the question of the tax consequences of a property division is simply a question of fact governed by the court's findings. The question of tax consequences of a property division depends not only on the nature, value, and division of the property, but also on the meaning and application of the Internal Revenue Code and its implementing regulations. Expert testimony is relevant to the question of tax consequences in the sense that an expert is qualified to testify as to the application of the tax laws. However, Warren's lack of expertise did not prevent either party from making an adequate record for the court to consider tax consequences.

The issue is whether, once the issue of tax consequences was raised, the trial court was required to consider the tax consequences of distributing Warren's retirement account in making an equitable division of property. Tax consequences is not one of the *Merrill* factors that a court is required to take into account in making an equitable distribution. Nonetheless, the list of *Merrill* factors is not exhaustive. *Lang*, 741 P.2d at 1196. Moreover, we have recognized that the tax consequences of dividing property are relevant in making that distribution equitable. In *Mann v. Mann*, 778 P.2d 590 (Alaska 1989), we held that the State of Alaska Supplemental Employee Benefits earned during marriage are subject to equitable division. 778 P.2d at 592. We wrote that if such benefits are subject to current redemption, "the court should take taxes and any penalties for early withdrawal into account in its equitable division."[3]

We have not, however, previously announced any general guidelines addressing when the superior court is required to consider the tax consequences of its division of property. The California Supreme Court has held that the trial court shall consider the tax consequences when dividing community property only when there is proof of an "immediate and specific tax liability." *Weinberg v. Weinberg*, 67 Cal.2d 557, 63 Cal.Rptr. 13, 432 P.2d 709, 714 (1967). The California court ruled that the trial court did not abuse its discretion in failing to consider the tax consequences of awarding a money judgment for the value of the

2. Charlene also contends that Warren's argument is without merit because Warren waived his right to appeal this point under Civil Rule 52(b) when he voluntarily acquiesced to the court's judgment that Warren's testimony constituted insufficient evidence to make a finding on the tax consequences.

Charlene is mistaken. First, as discussed below, the question of the tax consequences of particular division of property is not a question of fact, but a question of law. Thus, Civil Rule 52(b) does not apply. Second, even if it did apply, Warren's failure to object would not constitute a waiver of his right to appeal the court's failure to make a finding as to the tax consequences of the property division. Civil Rule 52(b) provides in part:

When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised *whether or not the party raising the question has made in the court an objection to such findings or has made a motion to amend them or a motion for judgment.*

We have construed the emphasized language to reject the argument that a party has waived its right to challenge a finding on the ground that he did not object to it below. *Casperson v. Meech*, 583 P.2d 218, 221 n. 3 (Alaska 1978); *Isaacs v. Hickey*, 391 P.2d 449, 452 (Alaska 1964).

3. *Id.* Our decision in *Burrell v. Burrell*, 696 P.2d 157 (Alaska 1984) is not inconsistent with this ruling. In *Burrell*, we held that the superior court did not err in failing to consider the husband's potential tax liabilities under a Supreme Court decision in determining the division of his separate property interest in a trust account. 696 P.2d at 167. Although we stated that the husband failed to cite any authority to support his assumption that the court should consider tax consequences, the basis for our holding was that the husband failed to raise the issue of tax consequences below. 696 P.2d at 166–67. We expressed no opinion on the issue presented here, that is, whether and to what extent a court must consider tax consequences once a party has raised the issue.

wife's interest in the husband's wholly-owned corporation instead of ordering a stock distribution to her. The court explained its decision as follows:

> Although there will be tax consequences if defendant satisfies the judgment by withdrawing funds from the corporations or selling some of his stock, there is no indication that he must or intends to do either to satisfy the judgment. He may choose to borrow the money or make the payments out of other property. Of course, once the property is divided pursuant to the trial court's order, the tax consequences may vary on further sale or liquidation from what they would have been had the property been divided differently. The trial court need not speculate on such possibilities, however, or consider tax consequences that may or may not arise after the division of the community property.

*Weinberg*, 432 P.2d at 714. Where the trial court orders that property be distributed in a way that creates an immediate and specific tax liability, however, the court is required to consider that liability.[4]

■ We agree with the California Supreme Court that the superior court shall consider the immediate and specific tax consequences of its division of property. The tax consequences of dividing property may alter the effective terms of a particular division so substantially as to make an otherwise equitable division inequitable. At the same time, the court is not required to speculate on or to consider tax consequences in the absence of proof that a taxable event will occur in connection with the division of property.

In this case, the parties agreed that the distribution of moneys from the retirement account would have immediate tax consequences. *Supra* p. 886. It appears that they were correct. Warren obtained a gross distribution of $90,278 from the account. Of that amount, his employer reported $84,541 in taxable income to him. Thus, Warren will pay tax on the $58,275 he must distribute to Charlene.[5] Assuming Warren is in the 28% bracket, Warren will pay $16,317 in taxes on those funds. The ultimate effect of this is to reduce Warren's share of the total property divided from $50,737 to $34,420. Since the court-ordered distribution of the account has immediate and specific tax consequences, the court should have considered those consequences in deciding on an equitable division of property.

■ The court's duty to consider tax consequences, however, does not mean that it must determine tax consequences in the first instance. As with any legal issue, it is the parties' responsibility to advocate how they believe the tax code and regulations apply to the disposition of property so that the court can make a reasoned decision. Of course, parties may introduce expert testimony from accountants or other tax experts to support their legal conclusions, but they are not required to do so. In this case, the court was justifiably unwilling to rule on the tax consequences of its disposition of the retirement account because neither party told the court what it believed those consequences to be. At the same time, since the parties raised the issue of tax consequences and agreed that they would attend the court's disposition of the

---

4. *In re Marriage of Epstein*, 24 Cal.3d 76, 154 Cal.Rptr. 413, 592 P.2d 1165–1171 (1979) (trial court should have accounted for the capital gains tax that would have to be paid as a result of its order to sell the family residence); *In re Marriage of Clark*, 80 Cal.App.3d 417, 145 Cal. Rptr. 602, 605–06 (1978) (trial court was required to consider the tax consequences of its order requiring the husband to issue the wife the value of her stock in their closely-held corporation in the form of a secured promissory note).

5. The court may have been able to avoid this result by issuing a Qualified Domestic Relations

Order (QDRO) to the administrator of the retirement plan directing him to make payments directly to Charlene. The QDRO is available for any plan covered by the Employee Retirement Income Security Act of 1974 (ERISA), Publ.L. No. 93–406, 88 Stat. 832 (1974). The QDRO directs the administrator of the pension plan to make payments directly to the non-employee former spouse. 29 U.S.C. secs. 1056(d)(3)(A)–(B). The QDRO solves the problem of continuing financial entanglement between former spouses and ensures that each spouse receives the payments to which he or she is entitled. *Laing v. Laing*, 741 P.2d 649, 658 (Alaska 1987).

retirement account, the court should not have refused to consider such consequences, especially when they could so severely alter the effective division of property. In this situation, we believe that the proper course would have been for the court to acknowledge that it had to rule on the issue of tax consequences as a matter of law and order the parties to present points and authorities or introduce expert testimony to support their positions about the tax effects of distributing the retirement account. We reiterate that the court would not have been put in this position had the parties adequately briefed and argued the issue of tax consequences.

■ Since the division of property already has been accomplished and taxes should have been paid, the court on remand should consider the actual tax consequences of the withdrawal of funds from the retirement account and reassess whether the division of property remains equitable. To accomplish this, the court may reopen the record to allow the parties to introduce evidence of their tax liabilities with respect to the withdrawal of funds from the retirement account.[6] If the court concludes that the division is no longer equitable, it should order an appropriate adjustment.

The judgment of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

**6.** For example, the trial court valued the retirement account at $87,412. The trial court based this figure on the September 30, 1988 Statement of Plan Benefits from Grace Drilling Co. However, according to Warren's 1099–R for 1989, the gross distribution of the account was $90,278, of which $84,541 was taxable. While we recognize that the trial court did not have these figures at trial and, in fact, could not have had them since it was the trial court's very order which triggered the distribution, we nonetheless direct the trial court to consider the 1099–R figures on remand.