*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DEA DUNDAS, | ) | |
| | ) | Supreme Court No. S-15599 |
| Appellant, | ) | |
| | ) | Superior Court No. 3CO-11-00005 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JAMES DUNDAS, | ) | |
| | ) | No. 7070 – December 11, 2015 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: G.R. Eschbacher and Justin Eschbacher, Anchorage, for Appellant. Rhonda F. Butterfield, Wyatt & Butterfield, LLC, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.      INTRODUCTION

A couple filed for divorce, but the divorce was not finalized for nearly three-and-a-half years. In the interim the couple continued to treat certain bank accounts as marital and others as separate, making it difficult for the superior court to later determine when the joint marital enterprise ended and how to value the bank accounts.

This appeal presents issues under each step of the equitable distribution process — identification, valuation, and distribution — as well as issues of alimony, child visitation expenses, and child support credits. As set forth below, we remand for further proceedings on a number of these issues.

## II.    FACTS AND PROCEEDINGS

Dea and James Dundas married in 1997 after a lengthy relationship. James began commercial fishing in the early 1990s, and in 1992 attended heavy equipment school in Washington. In 1993 Dea received an associate's degree in marketing, management, and business from an Oregon community college. In the late 1990s James and Dea began operating a bed and breakfast (B&B). They later acquired a home on the same road as their B&B and constructed a large shop adjacent to their home. James and Dea formed Dundas, Inc. — a construction company focusing on excavation — with Dea owning 60% and James 40%; they acquired a gravel pit (pit property) for storing equipment. James worked seasonally for the State plowing snow from roads; as a Public Employees' Retirement System (PERS) Tier 3 employee, James's job with the State provided health insurance for the family. James also worked as an on-call oil spill responder for Alyeska.

Dea raised their two sons, operated the B&B, kept the books for their businesses, and filed their taxes. Dea also was an expediter for the fishing and construction businesses, purchasing and delivering supplies to job sites and to James's boat. According to Dea, James is one of the best heavy equipment operators in the area, and James acknowledges that Dea's hard work was a substantial reason for their financial success. Through their industry and skill, James and Dea acquired roughly $1.7 million in marital assets.

In January 2011 Dea filed for divorce, and James moved out of the marital home later that year. On October 25, 2012 they attended a mediation session with a

retired judge and agreed to treat all funds currently in their bank accounts as marital but to treat all future earnings as separate.

Before trial Dea informed the court that she planned to relocate to Oregon with the children to pursue higher education and be closer to her family. Dea requested 65% of the marital property, both rehabilitative and reorientation alimony, and attorney's fees. Before trial James requested a 50/50 marital property division and argued that Dea should not be awarded alimony or attorney's fees. The divorce trial lasted five days between May 2013 and February 2014.

Dea hired a financial expert, Sheila Miller, who prepared Dea's property spreadsheet and valued the parties' bank accounts and annual cash flows between 2011 and 2013. Miller entered both the bank account and cash flow values as marital property on Dea's proposed property spreadsheet. During trial Miller testified at length, and the court found her testimony credible.

In early April 2014 the court ordered Dea to pay all of the children's visitation expenses if she chose to relocate to Oregon. In late April the court issued findings of fact and conclusions of law. The court determined that James and Dea ceased functioning as an economic unit on October 25, 2012, the date of their mediated agreement. The court valued the parties' bank accounts according to Miller's testimony, but it disregarded Miller's separate cash flow analysis.

The court divided the parties' substantial marital property equally, awarding Dea the B&B, the pit property, and proceeds from heavy equipment sold during trial. The court gave James a credit for his estimated 2013 income tax liability. The court also ordered James to pay child support from October 25, 2012 onward, but credited marital expenses he had paid in 2012 and 2013 against his arrearage. On reconsideration the court denied Dea's renewed request for attorney's fees and her request that she not pay the children's full visitation expenses.

Dea appeals, primarily challenging the superior court's decisions on: (1) the parties' economic separation date; (2) the marital property distribution; (3) James's credit for his 2013 income tax liability; (4) James's potential PERS retirement health benefits; (5) the valuation of certain marital accounts, properties, and cash flows; (6) the tax liabilities associated with the sales of marital property awarded to Dea; (7) her alimony requests; (8) the children's visitation expenses; (9) James's child support credit; and (10) her attorney's fees request.

## III. DISCUSSION

### A. Economic Separation Date

We have characterized the separation date as when " 'the marriage has terminated as a joint enterprise' or when a couple is no longer 'functioning economically as a single unit.' "[1] Because the separation date may determine whether acquired property is marital or separate, this date is critical to the identification and valuation of the marital estate; it "should ideally be set at the actual termination point of the marital partnership, so that assets which are not actual fruits of the parties' joint efforts are not included in the marital estate."[2] Determining "the separation date is a fact-specific

---

[1]     *Tybus v. Holland*, 989 P.2d 1281, 1285 (Alaska 1999) (quoting *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994)).

[2]     1 BRETT TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.28, at 423 (3d ed. 2005); *see also id.* at 435-36 ("The date of separation is the date on which the parties separate finally, with intent to terminate the marital relationship. This definition has two elements, one objective and one subjective. The objective element is that the parties must separate — live physically apart from one another. . . . The subjective element is that at least one party must intend to terminate the marriage." (footnotes omitted) (citing, approvingly for the proposition, three Alaska cases:  *Tybus*, 989 P.2d at 1281; *Ramsey v. Ramsey*, 834 P.2d 807 (Alaska 1992); and *Jones v. Jones*, 835 P.2d 1173 (Alaska 1992))).

inquiry,"[3] and the superior court accordingly has considerable discretion in this area.[4] We have affirmed separation date determinations based upon various factors,[5] but one party's "continuing economic dependence alone does not indicate the continuance of the marital economic unit."[6]

The superior court determined that James and Dea "basically acted as a married couple" up until July 2012, when marriage counseling efforts failed. The court concluded that the parties ceased to function as an economic unit on October 25, 2012 — the date of their mediated agreement — for three reasons. First, on that date they each agreed to "work on a marital business but [to] treat that income as separate." Second, finding on these facts that a marital partnership continued "would mean that no couple ever could separate as long as one continued to operate a marital business." And finally, from that date onward, Dea operated the B&B while James fished and fulfilled his oil spill response contract "without any real input or involvement from the other party."

Dea argues the court abused its discretion by selecting October 25, 2012 as the parties' economic separation date because neither party advocated for this date at

---

[3]    *Tybus*, 989 P.2d at 1285.

[4]    *See Schanck v. Schanck*, 717 P.2d 1, 3 (Alaska 1986) ("We decline to specify, as a matter of law, . . . the effective date when [post-separation] earnings become severable from [pre-separation] marital property . . . . Each case must be judged on its facts . . . .").

[5]    *See Inman v. Inman*, 67 P.3d 655, 659-60 (Alaska 2003) (examining factors such as sexual relations, economic support, commingling of assets, joint tax returns, joint liability, and manifesting a desire to continue the marriage); *see also Tybus*, 989 P.2d at 1285 (affirming separation date determination based on one party's physical act of re-keying locks manifesting intent to end marriage that was so understood by other party).

[6]    *Ramsey*, 834 P.2d at 809; *see also Tybus*, 989 P.2d at 1285 (finding meritless argument that "sexual contact between the parties is a dispositive factor in determining [the] date of separation").

trial, the evidence supports using the date of divorce, and at the October 25 mediation both parties believed the divorce trial would commence in a few months when in fact it began in May 2013 and concluded in February 2014. But the record reflects that when James left to fish in July 2012 — and certainly by October 25 when Dea and James entered into their mediated agreement — there was no real hope of reviving the marriage. They attended mediation in part to impose order on their contentious relationship, agreeing on "boundaries" with respect to each other's privacy and new romantic partners and setting rules pending a final divorce.

In fixing the date of economic separation, the superior court discussed relevant Alaska case law, noted "the fact that the parties are economically interdependent or that their finances remain commingled does not, of itself, mean that the 'marital economic unit'/'marital enterprise' continued," and thoroughly explained its reasoning. We conclude that the superior court did not abuse its discretion by determining that the parties ceased functioning as a joint marital unit on October 25, 2012.

### B. Marital Property

The equitable distribution of the marital estate involves three basic steps: "(1) [identifying] what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[7] "Factual findings supporting marital property distribution 'must be sufficient to indicate a factual basis for the conclusion reached.' "[8]

Because we are remanding to the superior court for further findings and clarification about a number of issues, including: (1) the identification and valuation of

---

[7]     *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013).

[8]     *Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013) (quoting *Cartee v. Cartee*, 239 P.3d 707, 713 (Alaska 2010)).

certain marital property; (2) Dea's alimony requests; and (3) the impact of tax consequences on the equitable distribution of the parties' marital property, we do not reach the question whether the court's equal division of marital property was within the bounds of its discretion.[9]

### 1.    Identification and valuation

The superior court's identification of property available for distribution is reviewed for clear error.[10] Generally "only property created by the enterprise of marriage . . . should be subject to division."[11] Identification of some property may present issues of law that are reviewed de novo.[12] The valuation of marital assets is a factual determination reviewed for clear error.[13] With this standard of review in mind, we affirm the superior court's identification and valuation of the parties' marital property, with the following exceptions.

### a.    It was clearly erroneous to give James a credit for his 2013 personal income tax liability.

The superior court gave James a $33,274 credit for his 2013 personal income tax liability. But the court chose October 25, 2012 as the date of the parties' economic separation. Therefore any income James earned in 2013 is separate income,

---

[9]    *See Stevens v. Stevens*, 265 P.3d 279, 289 (Alaska 2011) (per curiam) ("Because we are remanding the case for revaluation of the real property and the vehicles, the trial court will have to also make a new equitable distribution determination, and it is free to reevaluate all of its rulings in light of new evidence.").

[10]    *See Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014).

[11]    *Schanck v. Schanck*, 717 P.2d 1, 2 (Alaska 1986).

[12]    *See Tybus v. Holland*, 989 P.2d 1281, 1284 (Alaska 1999).

[13]    *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013).

not marital,[14] and on appeal both Dea and James agree that James should not have received this credit. James argues that because the equalization payment to correct this error is only 1.9% of Dea's total property award, the error is harmless. But James's tax credit improperly reduced the value of the marital estate available for distribution and should be corrected, especially in light of our remand on other issues discussed below. Accordingly we remand this issue for the superior court to correct.[15]

###### b. It was clearly erroneous not to identify James's potential PERS health benefit as marital property.

"To the extent [retirement health benefits] are earned during marriage, they are marital property."[16] The superior court made no findings about James's non-vested but potential PERS retirement health benefit. In *Thomas v. Thomas* we considered how to value a spouse's non-vested pension when the spouse needed to work one of the

---

[14] *See Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013).

[15] James also argues in his appellee's brief that the superior court should not have allowed Dea to file a joint 2012 tax return and that this tax issue should be addressed on remand. We reject James's argument; if James wished to contest this issue on appeal, he should have filed a cross-appeal. *See* Alaska R. App. P. 212(c)(1)(F) ("In cases of cross-appeal, the cross-appellant may present a statement of the issues presented for review which would require determination if the case is to be reversed and remanded for further proceedings in the trial court."); *Andersen v. Edwards*, 625 P.2d 282, 285 (Alaska 1981) (refusing to consider appellee's argument because "[a]ppellee neither filed a cross-appeal nor a cross-statement of points in appellant's appeal," and " '[o]rderly procedure will not permit an appellee to attack a judgment for the first time in his brief in the appellant's appeal' " (quoting *Alaska Brick Co. v. McCoy*, 400 P.2d 454, 457 (Alaska 1965))).

[16] *Engstrom v. Engstrom*, 350 P.3d 766, 770 (Alaska 2015) (citing *Hansen v. Hansen*, 119 P.3d 1005, 1014-16 (Alaska 2005)).

following three years to vest but testified it was "highly improbable" she would do so.[17] We explained that "when it is apparent . . . that a non-vested pension will not vest," the pension may either be forfeited or the employee's contributions to the pension may be refunded.[18] But because the superior court in *Thomas* applied a present value to the pension without making findings on whether the pension would be refunded or forfeited if it did not vest, we remanded for the court to clarify its valuation of the pension.[19] We stated that unless there is a finding that a pension will not vest, it is clearly erroneous not to reserve jurisdiction over it.[20]

Dea argues the court should have retained jurisdiction over this benefit. Dea notes that although James quit his State snow-plowing job, nothing prevents him from returning to work and vesting, at which point Dea would be eligible for a portion of that benefit because James earned it during the scope of their marriage. James argues that Dea did not raise this issue or present proof on it below, and that it is therefore waived. James is incorrect. Dea included James's retirement health benefit as marital property on her spreadsheet, noting that James had not yet vested but that the benefit should be "valued upon vesting at a future hearing." At trial Miller testified James needed about four more years to vest and recommended that James's retirement health benefit be divided through a qualified domestic relations order (QDRO). The superior court divided James's PERS pension through a QDRO, but it did not allocate James's retirement health benefit even though Miller testified at some length on this issue. We therefore remand for the superior court to address this apparent oversight.

---

[17]  815 P.2d 374, 375 (Alaska 1991).

[18]  *Id*. at 376.

[19]  *Id*. at 375-76.

[20]  *See id.* (citing *Laing v. Laing*, 741 P.2d 649, 657 (Alaska 1987)).

c.  **The identification and valuation of the joint fishing account and James's annual cash flows are unclear.**

i.  **Miller's cash flow and bank account valuation methods**

Dea's financial expert, Sheila Miller, prepared a report based on tax records, bank statements, and other documents generated during the divorce. Miller treated all income between 2011 and 2013 as marital, but valued each party's individual bank accounts as of January 1, 2011. She captured "transfers from joint accounts into individual accounts" using annual cash flow summaries for Dea and James and identified these transfers as marital property on Dea's proposed property spreadsheet.

Miller explained how she formulated the cash flows using James's 2011 cash flow as an example: "[After considering] marital and business expenses . . . James had available to him $158,000. . . . [I] put [that amount] as an asset on the property table. It's the cash flow that he collected from the business[es]." Miller testified that her 2011 cash flow analysis for James represented "the money that he received — the net cash flow that [James] received from his work efforts in 2011."

Miller also explained how she prepared Dea's property worksheet. Because Dea took funds from a joint account and transferred them to her personal account in January 2011, Miller valued that personal account as of January 2011 and allocated it to Dea as part of the marital estate. Miller then explained that she used a valuation date of December 2013 for other accounts. Miller determined that the money going into and out of those accounts was marital and was used to pay marital debts; the December 2013 balance represented "the remaining marital balance."

To ensure it understood Miller's valuation methods, the court asked her why she had valued four accounts as of 2011 "and everything else, 2013?" Miller replied that the 2011 accounts were appropriated by the parties "individually on that date.

-10-                                                                7070

Everything that was used since then — all of the accounts that were used solely for marital purposes, between January 1 of 2011 and December 31 of 2013, I used a December 31, 2013 date."[21]

The court then stated:

> If I understand your answer correctly, those four accounts were, in your review of the . . . financial records . . . one or the other party took those, put them in a separate account and used them for separate purposes, and so you treated those, essentially, as taking a marital asset already?
>
> . . . .
>
> And then the others were joint — stayed joint, and, so, that's why you kept them joint all the way through?

Miller responded affirmativly, noting she had treated the marital accounts each party appropriated in 2011 "as a disposition of marital assets prior to trial."

### ii. Miller's testimony regarding the joint fishing account and James's annual cash flows

James and Dea had a joint fishing account. According to Miller, James transferred about $50,000 from the joint fishing account into one of his personal accounts (account 1) in January 2011, and in August 2011 James transferred another $77,000 from the joint fishing account into a different personal account (account 2).

When the court noted Dea's property spreadsheet had a zero for account 1, Miller replied: "[T]he balance in the account is not zero, but, I've included it elsewhere." The court then asked whether James's personal account 1 was "a zero as part of the marital estate," and Miller replied: "Yes . . . because I've captured that number." The

---

[21] *Cf. Schaub v. Schaub*, 305 P.3d 337, 344 (Alaska 2013) ("Marital assets that are spent after separation for . . . normal living expenses are not typically taken into account in the final property division." (alteration in original) (quoting *Partridge v. Partridge*, 239 P.3d 680, 692 (Alaska 2010))).

court responded, "[m]y spreadsheet is the value to the marital estate," to which Miller responded affirmatively.

The court later stated: "There was a line on the old spreadsheet called '2012 fishing profits.' The husband said zero; the wife had a value. Given [Miller's] testimony, she is now saying it is in other accounts in other ways." Miller agreed that "the 2012 fishing profits" could be taken off the spreadsheet because of "all the other work" that Miller did, but she never testified that the 2012 fishing profits were included in other bank accounts in other ways; the "other work" to which Miller referred was her cash flow summary. Miller emphasized that when James took funds from the joint fishing account and placed them in his personal accounts, these amounts were captured in her cash flow analysis rather than her bank account valuations. She testified that her bank account valuations were "estimates" but that her cash flow summaries on Dea's marital property spreadsheet were "accurate."

Because Miller's proposed spreadsheet did not give James's account 2 a value, the court asked if that account could be taken off Dea's property spreadsheet. Miller replied: "I treated [account 2] as [James's], *because I captured his cash flow . . . rather than doing the account*." (Emphasis added.) The court responded: "[I]t's in other accounts . . . right?" Miller confirmed only that James's earnings were captured by her cash flow analysis, not that they were contained in her valuations of the parties' bank accounts.

Miller had earlier testified that James's net cash flow summary for 2012 was $102,850. Most of the income was from commercial fishing, but some was from his oil spill response contract. James started his 2012 commercial fishing season in July. Afterward he attended the October 25, 2012 mediation session with Dea, agreeing that any future earned income would be separate.

### iii. Given the superior court's determination of the parties' economic separation date, the valuation of James's 2012 income may be clearly erroneous.

The superior court completely adopted Miller's testimony to value the marital bank accounts, but it did not adopt Miller's recommendations concerning the parties' net cash flows. The court reasoned that the cash flows were captured in Miller's bank account valuations.

Dea argues that the court misconstrued Miller's testimony because her valuations of the parties' bank accounts were reliable only if the court also accepted Miller's valuations of the parties' cash flows. Because the court credited only half of Miller's testimony, Dea contends James was awarded "a substantial windfall." Dea argues the court undervalued James's earnings, some of which were marital. James responds that Dea cannot claim error on appeal because the superior court adopted her expert's bank account valuations. The court did not identify the cash flows as marital property, James argues, because this would have double-counted James's income.

Under the superior court's analysis James's 2012 fishing profits would have been marital because they were earned before October 25, 2012, but the court did not value them at all, interpreting Miller's testimony to mean that those earnings were included in "other accounts." The court further reasoned that "Miller's analysis rests on the assumption that all of the income earned by the parties was marital. But the cash flows included income clearly personal to James, including most importantly his income as an employee of the State of Alaska." James quit his State job in late October 2013, but anything he earned before October 25, 2012 would have been marital property, not James's separate property.[22]

---

[22] *See Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013) ("Marital property (continued...)

We note that in May 2013 James valued his accounts 1 and 2 together at roughly $167,000, listing them as fishing profits from 2010 to 2012. This is a greater sum than the $71,376 value the court gave the parties' joint fishing account. At one point the parties apparently agreed that account 1 contained about $110,000, but the court valued this account at zero, and it did not include James's personal account 2 on its final property spreadsheet. We also note that by James's May 2013 calculation, about $1,800,000 of total marital property was available for distribution; but by the court's calculation, the amount was about $1,700,000. The difference between James's valuation and the court's is about $100,000, corroborating Miller's testimony that James had a net cash flow in 2012 of about $100,000.

It appears that when the court removed the 2012 fishing profits from the property spreadsheet — reasoning that James's account 1 and account 2 were "part of other accounts" — it deprived the marital estate of substantial assets because Miller captured them in her cash flow analysis and not in her bank account values. Whether these accounts were properly identified and valued present close questions of fact. We remand this issue for further consideration to ensure that the pre-October 25, 2012 marital income was properly identified and valued.

### d. There are insufficient findings to determine whether the smaller account was properly valued.

Dea argues that the court awarded her an account valued at $4,350 but that the account was actually worth only $800 because James withdrew about $3,500 from it to pay income taxes. Dea bases her argument on Miller's trial testimony. The court's

---

[22] (...continued) includes all property acquired during the marriage, excepting only inherited property and property acquired with separate property." (quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004)) (internal quotation marks omitted).

property spreadsheet accurately notes Miller's testimony valuing the account at $800 alongside James's suggested value of $4,350. The court's notation for that row reads "[Dea] corrected at trial," when in fact Miller corrected James's valuation of this account at trial. It is unclear why the court credited James's value of this account when Miller's testimony was unrefuted, and on remand the court should explain its reasoning.[23]

## 2. Distribution

We review the superior court's equitable distribution of property for abuse of discretion.[24] "While the trial court [does not need to] make findings pertaining to each [statutory] factor, its findings must be sufficient to indicate a factual basis for the conclusion reached. Whe[n] the trial court makes these threshold findings, we generally will not reevaluate the merits of the property division."[25]

### a. It was an abuse of discretion to ignore the tax consequences of selling certain marital property.

The superior court does not need to consider speculative tax consequences that may arise from its division of marital property, but when it "orders that property be distributed in a way that creates an immediate and specific tax liability . . . the court is

---

**23** *See Stanhope v. Stanhope*, 306 P.3d 1282, 1287 (Alaska 2013) (" '[T]he trial court must render findings of ultimate fact that support any decreed property division; the findings must be explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision.' " (quoting *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013))).

**24** *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015). An abuse of discretion occurs in this context when the superior court "considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others." *Id*. (quoting *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005)).

**25** *Stanhope*, 306 P.3d at 1289 (quoting *Cartee v. Cartee*, 239 P.3d 707, 713 (Alaska 2010)).

required to consider that liability."[26] The party seeking to equitably allocate the tax consequences must present "proof that a taxable event will occur in connection with the division of property."[27] The reason for considering these tax consequences is that they "may alter the effective terms of a particular [property] division so substantially as to make an otherwise equitable division inequitable."[28]

Dea argues that by failing to account for the tax consequences from her sale of heavy equipment during the divorce trial, the court unbalanced its 50/50 marital property distribution. Dea also argues that the court should have accounted for the tax consequences she would incur by selling both the gravel pit property and the B&B because the court knew when it awarded them to her that she would have to sell those properties.

i. **Tax consequences of equipment sold before property division and of corporation**

In August 2013 Dea told the court she planned to sell an excavator, a trailer, and a dump truck for $54,500. The equipment was held by the couple's corporation. In an earlier June letter James's lawyer had informed Dea's lawyer "that most of the construction equipment is fully depreciated, and when Dea sells any piece of equipment *she must reserve a large portion of the proceeds so she can pay capital gains taxes.*" (Emphasis added.) Dea emailed James the offer details, and James agreed to it. Dea then sold the equipment. Afterwards James argued to the superior court that Dea should bear

---

[26] *Oberhansly v. Oberhansly*, 798 P.2d 883, 887 & n.4 (Alaska 1990); *cf. Dodson v. Dodson*, 955 P.2d 902, 909 (Alaska 1998) (holding that superior court did not abuse its discretion by considering tax liability in connection with division of marital property when tax's "precise magnitude" was "unpredictable").

[27] *Oberhansly*, 798 P.2d at 887.

[28] *Id*.

the tax consequences of this sale.  Dea asked the court to equitably divide the tax consequences.  The court approved the sale in early October 2013, writing that it "will address distribution of the proceeds at trial."

In its final property division the court awarded the equipment sale proceeds to Dea, but it did not account for the sale's tax consequences.  Both parties understood the sale had tax consequences, but the superior court was presented with no evidence on what those consequences would be.  We have explained that in this situation, "the proper course [is] for the court to . . . order the parties to present points and authorities or introduce expert testimony to support their positions about the tax effects."[29]

The superior court determined that "any issues regarding the tax consequences of the [equipment] sale are moot, since Dea will receive the [proceeds] and so will have to deal with any such tax consequences."  But "tax debts are incurred when a taxable event occurs, and not when a formal tax return is filed."[30]  By ordering Dea to shoulder the full tax consequences of the equipment sale, the court burdened her with what is likely a substantial liability.  It was an abuse of discretion to disregard the effect of these tax consequences on the marital property distribution.  Because the parties agreed to sell this marital property prior to the court's property division, the tax consequences of this sale should have been treated as a marital debt.[31]

---

[29]    *Id*. at 888.  While expert testimony is helpful to the resolution of such issues, it is by no means necessary.  *See id*. at 886.

[30]    2 TURNER, *supra* note 2, § 8.28, at 913 n.22; *see also id*. ("A contrary rule would encourage delayed filing of tax returns in order to avoid consideration of tax consequences in the divorce case.").

[31]    *Id.* at 913-14 (noting that when a sale of marital property occurs before the property division "unpaid capital gains taxes are for all practical purposes an outstanding debt, and they should be classified and allocated between the parties" like any other

(continued...)

The superior court's order also states that Dea received the corporation's assets and that "James no longer has any interest in the corporation." We understand this order to mean that Dea was awarded ownership of the corporation. The parties presented very little evidence on the corporation's outstanding equities and liabilities. On remand the court also should account for any differences between these outstanding values and the tax consequences of the equipment sale.[32]

## ii. Tax consequences of pit property sale

In November 2013 Dea informed the court of an offer to purchase the pit property for $138,000, asking the court to permit a sale and equitably allocate the "sale and tax" impact. James opposed, arguing he needed either the pit property or the marital residence with its adjacent shop for his fishing equipment and that he should not bear any of the sale's tax consequences. Dea responded that the pit property was subject to a performance deed of trust requiring a structure to be erected on the property by August 2014 and that, given this encumbrance, a second offer was unlikely.

In February 2014 Dea testified that the offer still was outstanding. The court then asked Dea whether the pit property was worth $138,000, and she agreed to this value. Dea also submitted an exhibit Miller had prepared on the tax consequences of selling the pit property listing transactional costs and tax consequences between roughly $8,000 and $11,000. In April 2014 the court awarded Dea the pit property, basing its value on the $138,000 offer, but disregarded any transaction costs or tax consequences from the likely sale.

---

[31]     (...continued)
marital debt).

[32]     *Cf. Root v. Root*, 851 P.2d 67, 69 (Alaska 1993) (holding that if significant marital asset has been identified but no evidence has been presented as to its value, "the best practice is for the trial court to direct the parties . . . to fill the evidentiary void").

About eight months after the court's final property division, Dea sold the pit property. On these facts it was an abuse of discretion to not factor into the property division the tax consequences and transactional costs from the pit property sale. Dea presented specific evidence on this issue, the court based its value on the $138,000 offer, the court awarded the pit property to Dea because she could sell it easily to finance her move to Oregon, and Dea in fact sold the property. There was nothing speculative about whether a sale would occur or what the likely tax consequences would be.[33]

### iii. Tax consequences of B&B sale

In August 2013 Dea asked the court to authorize a sale of the marital B&B where James was living. Dea wanted the "net sale proceeds" to be "placed on her side of the ledger. But James responded that the gross sales proceeds should be allocated to Dea, acknowledging that the B&B was "depreciated to the fullest extent allow[ed] by federal income tax law."

The court ruled that Dea could sell the B&B. James moved for reconsideration, arguing it was improper to authorize a pre-divorce sale against his wishes. Dea responded that both of James's property tables listed the B&B in her column. Dea also stated she did not want to operate the B&B in the future and implied it was hard to sell property in Cordova's small real estate market.

---

[33]    *See Oberhansly*, 798 P.2d at 887 (holding that when proof is presented "that a taxable event will occur in connection with the division of [marital] property," the superior court should account for these tax consequences in its marital property division); *see also McDaniel v. McDaniel*, 829 P.2d 303, 307 (Alaska 1992) (holding transactional costs of selling awarded marital property should be considered when there is "evidence in the record . . . showing [both] that the party who will receive the asset intends an imminent sale, and . . . the estimated costs of sale" (quoting *In re Marriage of Berg*, 737 P.2d 680, 683 (Wash. App. 1987))).

On reconsideration the court recognized the parties' dispute over tax consequences, noting it had earlier ordered that issue resolved at trial "*regardless of whether the B&B is sold prior to trial*." (Emphasis added.) Stating that James's "real issue lies in the tax consequences of any sale" but that he did not wish to be awarded the B&B, the court permitted Dea to market the B&B and sell it subject to court approval. In its final marital property division, the court awarded Dea the B&B, but it did not account for the tax consequences of a likely sale even though it recognized Dea wanted to sell the B&B, not operate it.

The court's findings of fact continually reference Dea's impending move to Oregon. The court awarded Dea the B&B because she could liquidate it fairly easily to finance her move. And the court received evidence that the B&B was "depreciated to the fullest extent allow[ed] by federal income tax law." The parties agreed there would be tax consequences from selling the B&B and the court at one point decided to resolve this issue at trial, but it did not account for these tax consequences when it awarded Dea the B&B. On these facts it was an abuse of discretion to disregard the effect of tax consequences on the marital property distribution.[34]

### C.     It Was Error Not To Resolve Dea's Alimony Request.

Alaska has "a policy of encouraging trial courts to provide for parties' financial needs by property disposition, rather than by alimony."[35] "When a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a

---

[34]     *See Oberhansly*, 798 P.2d at 887-88.

[35]     *Dixon v. Dixon*, 747 P.2d 1169, 1173 (Alaska 1987).

larger share in the property distribution to aid him or her in [the post-divorce] transition."[36]

Where necessary, spousal support of a limited duration generally is preferred and it can be characterized as either reorientation or rehabilitative alimony.[37] We also have approved extended spousal support,[38] and have stated that "permanent alimony may be awarded when it is 'just and necessary.' "[39] Reorientation alimony " 'allow[s] the requesting spouse an opportunity to adjust to the changed financial circumstances accompanying a divorce,' " but "should ordinarily be awarded only 'when the property settlement will not adequately meet the parties' reasonable needs.' "[40] By contrast rehabilitative alimony does not require a finding that the property division does not adequately account for the parties' needs, and is intended to further one spouse's "job training or other means directly related to entry or advancement within the work force."[41]

---

[36] *Day v. Williams*, 285 P.3d 256, 261 (Alaska 2012) (quoting *Tollefsen v. Tollefsen*, 981 P.2d 568, 570 (Alaska 1999)).

[37] *See Jones v. Jones*, 835 P.2d 1173, 1179 (Alaska 1992) ("Either rehabilitative alimony or reorientation alimony where appropriate is, in general, to be preferred to permanent alimony because it is generally undesirable to require one person to support another on a long-term basis in the absence of an existing legal relationship.").

[38] *See, e.g.*, *Gallant v. Gallant*, 945 P.2d 795, 801 (Alaska 1997).

[39] *Hilliker v. Hilliker*, 755 P.2d 1111, 1112 (Alaska 1988) (quoting former AS 25.24.160(3) (1986)).

[40] *Davila v. Davila*, 876 P.2d 1089, 1094 (Alaska 1994) (quoting *Richmond v. Richmond*, 779 P.2d 1211, 1215 n.6 (Alaska 1989), *overruled on other grounds by Hansen v. Hansen*, 119 P.3d 1005, 1010 & n.16 (Alaska 2005)).

[41] *Id.* (quoting *Richmond*, 779 P.2d at 1215); *see also Barnett v. Barnett*, 238 P.3d 594, 601 (Alaska 2010) (stating rehabilitative alimony should be granted "to allow a recipient spouse who exits a marriage with few job skills and little earning capacity to

(continued...)

"The party seeking rehabilitative alimony should present an educational or job training plan so that the reviewing court can determine whether a support award is necessary and appropriate."[42]

In her pre-trial brief Dea requested "reorientation alimony to help out in the transition from [Alaska] to . . . Oregon" and rehabilitative alimony to help with her "educational and living costs," promising to provide the superior court a detailed plan. At trial Dea testified she had applied to a community college in Oregon, and she presented the court with an exhibit documenting her correspondence with the school, the classes she wished to take, and credit-hour and text book costs. The court did not address Dea's alimony request, and she now argues it erred by not doing so. Even if the superior court intended to deny Dea's alimony request, without factual findings we have nothing to indicate it considered the issue. Accordingly the court on remand should enter appropriate findings of fact and conclusions of law concerning Dea's alimony request.[43]

---

[41]     (...continued)
secure a means of earned income" (quoting *Fernau v. Rowdon*, 42 P.3d 1047, 1058 (Alaska 2002))).

[42]     *Tybus v. Holland*, 989 P.2d 1281, 1288 (Alaska 1999).

[43]     *See Sarah D. v. John D.*, 352 P.3d 419, 429 (Alaska 2015) (" 'Detailed and explicit findings' are necessary on appeal to give us 'a clear understanding of the basis of the trial court's decision, and to enable us to determine the ground on which the trial court reached its decision.' " (alterations omitted) (quoting *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962))); *cf. Davila*, 876 P.2d at 1094 ("In all cases . . . an award of alimony must be accompanied by adequate findings, particularly with respect to the financial needs and abilities of both parties . . . .").

**D.     It Was An Abuse Of Discretion To Order Dea To Pay All Of The Children's Visitation Expenses.[44]**

"After determining an award of child support . . . the court shall allocate reasonable travel expenses which are necessary to exercise visitation between the parties as may be *just and proper* for them to contribute."[45] The superior court must sufficiently explain its reasons for allocating visitation expenses.[46] Factors the court should consider include the costs of visitation and the parties' finances.[47] The superior court does not abuse its discretion by ordering visitation expenses split equally after considering the parties' financial situations,[48] but on two occasions we have found abuses of discretion because the superior court burdened one party with full visitation expenses without considering that party's financial circumstances.[49]

In a related line of cases concerning the best-interest custody factors, we have held that if the superior court finds that a parent has a legitimate reason to move, it "should not hold the move against the [parent]" because "[l]egitimately motivated moves are a common feature of 'today's mobile society.' "[50]

---

[44]     *See C.R.B. v. C.C.*, 959 P.2d 375, 384-85 (Alaska 1998) (establishing abuse of discretion standard of review for allocation of visitation expenses), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1085 (Alaska 2004).

[45]     Alaska R. Civ. P. 90.3(g) (emphasis added).

[46]     *Red Elk v. McBride*, 344 P.3d 818, 824 (Alaska 2015) (citing *Ronny M. v. Nannette H.*, 303 P.3d 392, 407 (Alaska 2013)).

[47]     *See id.* at 824.

[48]     *See C.R.B.*, 959 P.2d at 384-85.

[49]     *See McBride*, 344 P.3d at 824; *Ronny M.*, 303 P.3d at 407.

[50]     *Moeller-Prokosch v. Prokosch*, 53 P.3d 152, 155 (Alaska 2002) (quoting
(continued...)

Here the superior court concluded that "Dea's move is motivated by appropriate considerations and not by a desire to block James from having contact or time with his children." But the court then ordered that if Dea moved to Oregon, she would be responsible to "pay the costs of transportation for visitation in Alaska," because "she will have chosen to leave Alaska over James'[s] strong objection and has sufficient cash reserves and incentive to find work that she can afford to pay for the plane tickets." Dea moved for reconsideration, but the court denied her motion, writing that "[i]t is not fair to make James cover any costs associated with [Dea's] move." The court explained that Dea was "not being penalized; she is being ordered to accept the consequences of a voluntary move she plans to make."

Characterizing the court's order as a penalty, Dea now argues that she should not bear the full visitation expenses because she has a lower earning capacity than James. We agree with Dea. Having found that Dea's move was legitimate, the court then held the move against Dea by ordering her to pay the children's full visitation expenses. This was an abuse of discretion, and we therefore reverse the superior court's visitation expenses order. On remand the court shall enter a just and proper visitation expenses award after considering the parties' relative economic circumstances and the costs of visitation.

### E. James's Credit Against His Child Support Arrearage Is Not Sufficiently Supported By The Record.

The superior court fixed James's monthly child support obligation at $2,700 and determined that, from the parties' date of economic separation, James had a $45,900

---

[50]    (...continued)
*Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001)); *see also Rego v. Rego*, 259 P.3d 447, 454 (Alaska 2011) (stating that "we take seriously . . . alleged infringement[s] on a custodial parent's right to relocate").

arrearage. But based on Miller's testimony that James paid "marital expenses" in 2012 and 2013, the court "deem[ed] th[o]se payments to be payments made in lieu of child support," credited them against his arrearage, and determined that James owed about $18,200 in child support arrearage. The court did not further explain the nature of James's payment of "marital expenses."

Dea now argues the court failed to account for the fact that, according to Miller, $30,000 of the parties' 2012 marital expenses went to pay 2011 income taxes. Dea argues the court should have relied on a different portion of Miller's report to calculate James's credit. This portion shows that $2,450 from one of the parties' joint bank accounts went to "[k]ids['] expenses" in 2012 and 2013. Dea argues the court erred by failing to itemize James's marital expenses, and implies that James should have received a smaller credit against his child support arrearage.

"Whether a [child] support order exists or not, 'a parent is obligated both by statute and at common law to support his or her children.' "[51] Child support payments are meant to "contribute toward the nurture and education of [the parties'] children."[52] Child support is defined as "the contribution to a child's maintenance required of both parents," and it is intended "to ensure that child support orders are adequate to meet the needs of children, subject to the ability of parents to pay."[53]

---

[51] *Crayton v. Crayton*, 944 P.2d 487, 489 (Alaska 1997) (alteration omitted) (quoting *Matthews v. Matthews*, 739 P.2d 1298, 1299 (Alaska 1987)).

[52] AS 25.24.160(a)(1); *see also Koller v. Reft*, 71 P.3d 800, 807 n.24 (Alaska 2003) ("Meeting the needs of children is [a] laudable public policy.").

[53] Alaska R. Civ. P. 90.3 cmt. I.B; *see also Hunt v. Hunt*, 698 P.2d 1168, 1173 (Alaska 1985) (noting child support payments are intended to "maintain the children's accustomed standard of living").

The superior court may enter a child support award that is retroactive to the date of the parents' separation.[54] When parents separate and one then provides support to the children before a child support order is entered, the superior court's decision whether to credit the pre-order support against the obligor's arrearage is governed by the variation framework of Alaska Civil Rule 90.3.[55] Rule 90.3(c)(1) permits the court to "vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied." We have recently explained that "[t]he good cause inquiry *must* focus first and foremost on the needs of the children."[56] Under Rule 90.3(c)(1) "[t]he [superior] court must specify in writing the reason for the variation, the amount of support which would have been required but for the variation, and *the estimated value of any property conveyed instead of support calculated under the other provisions of this rule*." (Emphasis added.)

The superior court has some discretion to credit pre-order support given directly to the custodial parent or the children, but as always it must make sufficient findings of fact and conclusions of law to justify the credit.[57] On remand the superior court should determine whether "manifest injustice would result" if James's child

---

[54]    *See Ogard v. Ogard*, 808 P.2d 815, 816 (Alaska 1991); *see also* Alaska R. Civ. P. 90.3 cmt. I.B.

[55]    *See Ruppe v. Ruppe*, 358 P.3d 1284, 1290-92 (Alaska 2015); *see also Vachon v. Pugliese*, 931 P.2d 371, 382 (Alaska 1996).

[56]    *Ruppe*, 358 P.3d at 1291 (emphasis in original) (quoting *Koller v. Reft*, 71 P.3d 800, 807 (Alaska 2003)) (internal quotation marks omitted).

[57]    *Id.* at 1291-92; *see also Ogard*, 808 P.2d at 816-17; Alaska R. Civ. P. 90.3(c)(1).

support award is not varied downward to reflect his payment of pre-order expenses.[58] After "careful scrutiny of the facts,"[59] the superior court may credit James against his arrearage the portion of his marital expense payments that actually went to the children's needs and interests as opposed to James and Dea's joint marital debt.[60]

F. **The Court Should Revisit Dea's Request For Attorney's Fees After Conclusion Of The Proceedings On Remand.**

Attorney's fees in a divorce action are meant to "assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane."[61] The decision to award or deny such fees depends on "the relative economic situations and earning powers of the parties," including the distribution of marital property.[62] Because the parties' relative economic situations may change after the conclusion of the proceedings on remand, the superior court should reevaluate whether to award Dea attorney's fees.[63]

---

[58]    Alaska R. Civ. P. 90.3(c)(1).

[59]    *Coats v. Finn*, 779 P.2d 775, 777 (Alaska 1989).

[60]    *See* Alaska R. Civ. P. 90.3(c)(1). James bears the burden of proving his entitlement to a credit, *see Coats*, 779 P.2d at 777 & n.7, and on remand the superior court may in its discretion receive new evidence on this issue.

[61]    *Sarah D. v. John D.*, 352 P.3d 419, 425 (Alaska 2015) (quoting *Limeres v. Limeres*, 320 P.3d 291, 302 (Alaska 2014)).

[62]    *Id.* (quoting *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987)); *see also Siggelkow v. Siggelkow*, 643 P.2d 985, 989 (Alaska 1982).

[63]    *Cf. Heustess v. Kelley-Heustess*, 158 P.3d 827, 835 (Alaska 2007) ("Because the property division must be vacated, the economic conditions on which the court based its award of attorney's fees may change on remand.").

## IV.  CONCLUSION

We AFFIRM the superior court's decision on the parties' economic separation date, but we REMAND for further proceedings on the superior court's decisions concerning: (1) the ultimate division of marital property; (2) James's credit for his 2013 income tax liability; (3) James's PERS health benefit; (4) the valuation of certain marital accounts and cash flows; (5) the tax liabilities associated with marital property awarded to Dea; (6) Dea's alimony request; (7) James's child support credit; and (8) Dea's attorney's fees request.  We REVERSE the superior court's visitation expenses order.  We otherwise AFFIRM the superior court's judgment.  We do not retain jurisdiction.